**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | ) |
|  | ) **Chapter 15 Case** |
| **Fairfield Sentry Limited, et al.,** | ) |
|  | ) **Case No. 10-13164 (SMB)** |
| **Debtors in Foreign Proceedings.** | ) |
|  | ) **Jointly Administered** |
| **Fairfield Sentry Limited, et al. (In Liquidation), acting by and through the Foreign Representatives thereof,** | ) |
|  | ) |
|  | ) **Adv. Pro. No. 10-03496 (SMB)** |
| **Plaintiffs,** | ) |
|  | ) **Administratively Consolidated** |
| **-against-** | ) |
|  | ) |
| **Theodoor GGC Amsterdam, et al., Defendants.** | ) |
|  | ) |
| **This declaration applies to the adversary proceedings listed in Appendix A to Defendants' Consolidated Reply Memorandum of Law** | ) |
|  | ) |
|  | ) |

**SECOND DECLARATION OF SIMON MORTIMORE, QC**
**IN FURTHER SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, I, SIMON MORTIMORE, declare as follows:

1.    I am the same Simon Mortimore QC who executed a declaration herein on 13 January 2017 (the "**First Mortimore Declaration**") in relation to the Plaintiffs' motion for leave to amend the complaints and the Defendant Institutions' opposition to such motion and their motion for an order dismissing with prejudice the pending complaints in the above-captioned adversary proceedings brought against them by the Plaintiffs.

2.    I make this declaration to set out my views, as an expert in BVI and English law, on the second declaration of Gabriel Moss QC executed on 30 March 2017 (the "**Second Moss Declaration**") in support of the Plaintiffs' motion for leave to amend the complaints and in opposition to the Defendant Institutions' motions to dismiss.

3.      Unless otherwise indicated, in this declaration I shall adopt the abbreviations used in the First Mortimore Declaration. What I said in ¶¶ 3 and 4 of the First Mortimore Declaration applies to this declaration, including that my compensation for providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned Chapter 15 case or any associated adversary proceedings. I confirm that I agree with what Mr Moss says in ¶ 5 of the Second Moss Declaration about the fact that we both practice from the same chambers in Gray's Inn.

4.      On several occasions in the Second Moss Declaration,[1] Mr Moss says that I have misstated or misunderstood BVI or English law. While I find the tone of some of Mr Moss's criticisms disappointing, I shall not respond in kind. Instead, I will concentrate on the important points that may assist the Court and demonstrate that Mr Moss's criticisms are unjustified and that, where we disagree, he is wrong or misses the point. I will not answer all the points made by Mr Moss, and my failure to do so should not be interpreted as acceptance of what he says.

5.      Mr Moss also criticises me for expressing views on factual questions or on questions of mixed fact and law.[2] As I made clear in the First Mortimore Declaration,[3] I appreciate that the function of an expert on law is to state the law and explain how it applies to the facts stated in the Amended Complaints. Accordingly, I have referred to the facts stated in the Amended Complaints and other documents that I understand the Court will read on the motions before it, in order to explain why under BVI law the Amended Complaints do not state a case in the sense that, contrary to Mr Moss's opinion, the Amended Complaints do not set out properly arguable claims that are viable under BVI law.

---

[1] Second Moss Declaration at ¶¶ 9, 12, 18, 21, 26, 71, 78.

[2] Second Moss Declaration at ¶¶ 9, 44, 61, 103, 159, 160, 211, 274.

[3] First Mortimore Declaration at ¶¶ 3, 36, 115, 116, 134, 175, 200, 227.

6.      In forming my opinions, I have read (in addition to the documents described in the First Mortimore Declaration at ¶ 5) a copy of the declaration of David J. Molton, executed 31 March 2017, together with copies of (i) certain subscription agreements, governed by New York law (on which I do not express an opinion), (ii) two revised proposed amended complaints, one of which is the revised proposed fourth amended complaint in *Fairfield Sentry Ltd, et al. v. ABN Amro Schweiz AG et al.*, Adv. Pro. No. 10-03635 (SMB) (Bankr. S.D.N.Y. Apr. 3, 2017) (Dkt. No 270) (the "**Proposed Fourth Amended ABN Amro Complaint**"),[4] and (iii) certain brokerage and custody agreements (each a "**B&C Agreement**"), governed by the laws of the Netherlands or the Netherlands Antilles (on which I do not express an opinion, but shall assume they would be interpreted under those laws in the same way as they would be interpreted under BVI or English law).

7.      The Amended Complaints, the subject of the First Mortimore Declaration, allege that the Defendant Institutions were members of the Funds, in that their shares were or had been registered in their names. Unless otherwise expressly indicated, all references in this declaration to the Amended Complaints are to the proposed amended complaints in the form they were in when I made the First Mortimore Declaration. The Proposed Fourth Amended ABN Amro Complaint describes a different situation under which, pursuant to the B&C Agreements (i) a Citco company (defined as the "**Citco Record Subscriber**") held shares in the Funds as trustee for the Defendant Institutions, (ii) the Defendant Institutions maintained accounts with certain Citco banks (the "**Citco Banks**") into which all moneys received from or for the account of the Defendant Institutions were paid, and (iii) the Citco Record Subscriber

---

[4] So far as concerns Mr Molton's declaration, the proposed revised fourth amended complaint in Exhibit F is not materially different from the Proposed Fourth Amended ABN Amro Complaint. I am advised by counsel for the Defendant Institutions that the Proposed Fourth Amended ABN Amro Complaint is procedurally improper and that it and the other proposed revised fourth amended complaint in Exhibit F are not properly before the Court.

and the Citco Banks (collectively defined as the "**Citco Subscriber**") acted as agents for the Defendant Institutions in respect of investments in the Funds.[5]

8.      In general, the further amendments made in the Proposed Fourth Amended ABN Amro Amended Complaint would not make any difference to the issues under BVI law in relation to the Common Law Claims or the opinions I previously expressed in the First Mortimore Declaration, although they would give rise to a new issue as to whether knowledge of the Citco Subscriber should be attributed to the Defendant Institutions, on which Mr Moss expresses his opinion (Second Moss Declaration under the heading "**H. The Claims against bad faith recipients**" at ¶¶ 121-123). That is the only place where Mr Moss refers to the roles of the Citco Subscriber and the Citco Record Subscriber in relation to the Common Law Claims. I note that Mr Moss fails to address the fact that the roles of the Citco Record Subscriber or Citco Subscriber, as registered member of the Funds and party to the Redemption transactions and recipient of the Redemption Payments, would have a material adverse effect on the Liquidators' BVI Insolvency Act Claims in relation to the availability of remedies against the Defendant Institutions (see Section 10 below).

9.      It may assist if I briefly summarize my opinions on the main issues of BVI law that arise on the above-mentioned motions.

*The Common Law Claims (Sections 1-5 below)*

(a)      Disregarding the allegations of Citco bad faith, the Privy Council Judgment and, if there were no conclusive certificates, the judgment of the EC Court of Appeal on the Good Consideration Issue are binding decisions of BVI law, so that the Common Law Claims are futile and

---

[5] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 9, 106-124, 168-177. Confusingly, the Proposed Fourth Amended ABN Amro Complaint at ¶¶ 235, 247 alleges that the Citco Subscriber, not the Citco Record Subscriber, was the shareholder.

would be dismissed by the BVI Court (Section 1, paragraphs 11-17 below).

(b)    Further, the Funds are precluded by issue estoppel from pursuing the Common Law Claims against the Defendant Institutions, since (i) the Defendant Institutions have privity of interest with the PI Defendants, and (ii) the Funds could and should have taken the point of law that, if the certificates were not issued in good faith, the Funds would not be precluded from recovering money paid to redeemed members to the extent it exceeded the true Redemption Price (Section 2, paragraphs 20-40 below); alternatively, it would be an abuse for the Funds to pursue such proceedings (Section 2, paragraphs 41-49 below).

(c)    The allegation of Citco's bad faith does not enable the Funds to disregard the outcome of the Preliminary Issues and pursue the Common Law Claims, because (i) purported certificates (even if issued by Citco in bad faith) still have conclusive effect under Article 11(1) (Section 3, paragraphs 51-57 below), (ii) the Funds are bound by certificates issued by Citco as their agent (Section 3, paragraphs 58-63 below), and (iii) the Funds are prevented from taking advantage of Citco's alleged wrong, which is attributed to the Funds (Section 3, paragraphs 64-83 below).

(d)    In any event, in the Amended Complaints, the Funds fail to meet the standard of BVI law for alleging Citco's bad faith, since they do not plead specific facts sufficient to make out a case that Citco was wilfully blind as to the existence of the BLMIS Ponzi fraud (Section 4, paragraphs 98-104 below).

(e)     Even if the Citco Subscriber and/or Citco Record Subscriber were in bad

faith, their bad faith would not be attributed to the Knowledge Defendant

Institutions (Section 5, paragraphs 105-121 below).

*The BVI Insolvency Act Claims (Sections 7-11 below)*

(f)     The Amended Complaints fail to state viable unfair preference or

undervalue transaction claims, because a reasonable observer of all the

circumstances of the Funds, including the nature of their businesses as

described in the Amended Complaints as at the dates of the

Redemptions, but disregarding as impermissible hindsight and/or

speculation alleged claims against the Funds arising from the BLMIS

Ponzi fraud, would have found that the Funds were able to pay their

debts as they fell due as at those dates (Section 8, paragraphs 154-172

and Section 9, paragraph 182 below).

(g)     The Amended Complaints fail to state viable unfair preference claims,

because (i) the relevant transactions were the Redemptions, not the

Redemption Payments (Section 7, paragraphs 131-141 below), and, at

the time the Redemptions were entered into, the Defendant Institutions

were members, not creditors of the Funds (Section 8, paragraphs

145-153 below), and (ii) viewed by an objective observer at the times of

the Redemptions, they took place in the ordinary course of the Funds'

businesses as described in the Amended Complaints, disregarding

impermissible hindsight and speculation (Section 8, paragraphs 173-181

below).

(h)     The Amended Complaints fail to state viable undervalue transaction

claims, because (i) the Redemptions did not provide for the Funds to

receive no consideration, because they provided for shares to be surrendered to the Funds (Section 9, paragraphs 183-186 below), (ii) a reasonably well-informed purchaser at the times of the Redemptions would have regarded the Redemption Prices as reflecting proper arm's-length prices for the shares being surrendered (Section 9, paragraphs 187-203 below), and (iii) viewed by an objective observer at the times of the Redemptions, they were good faith business transactions benefitting the Funds' businesses, disregarding impermissible hindsight and speculation (Section 9, paragraph 204 below).

(i)     Section 249 of the BVI Insolvency Act is a substantive, not procedural, rule of BVI law under which, on an application by a liquidator, the BVI Court, if satisfied that there has been an unfair preference or undervalue transaction, may exercise its discretion to determine whether any, and if so what, order should be made (Section 11, paragraphs 217-231 below).

10.     Exhibit A to this declaration contains copies of legislation, cases and textbooks cited in this declaration, which have not been exhibited to the First Mortimore Declaration or the Second Moss Declaration.

## A.     THE COMMON LAW CLAIMS

## 1.     BINDING PRECEDENT OF THE PRIVY COUNCIL JUDGMENT AND THE DECISION OF THE EC COURT OF APPEAL

11.     In the First Mortimore Declaration (¶¶ 37-40), I expressed the opinion that (i) the Privy Council Judgment is a definitive statement of BVI law, binding on the BVI Supreme Court, and (ii) (apart from the bad faith issues discussed in Sections 4 to 6 of the First Mortimore Declaration) a Common Law Claim brought by the Funds against the Defendant Institutions, based on the same alleged mistake of fact and overstatement of NAV, would be bound to fail. The Second Moss Declaration does not appear to dispute this opinion.

12.     In the First Mortimore Declaration (¶ 36), I said that the Privy Council's decision left intact, and did not criticize, the judgments of the EC Court of Appeal or Bannister J on the Good Consideration Issue. Accordingly, I expressed the opinion that the judgment of the EC Court of Appeal also has the consequence that a Common Law Claim, as described in the preceding paragraph, would be bound to fail. In the Second Moss Declaration (¶¶ 12-18), Mr Moss disputes this opinion for two reasons: (i) where the reasoning of the appellate court differs from the reasoning of the lower court, it is the reasoning of the former court that is the source of any *res judicata*; and (ii) (in his opinion) the Privy Council Judgment rejects the reasoning of the EC Court of Appeal.

13.     As to Mr Moss's first ground, my opinion was directed to the question of whether the decision of the EC Court of Appeal regarding the Good Consideration Issue is binding on the BVI Supreme Court as a statement of law. I dealt with the question of *res judicata* later. On the issue of *res judicata*, I agree with Mr Moss that where an appellate court dismisses an appeal, it is the decision of the appellate court that is the source of any estoppel by *res judicata* regarding the point appealed.[6] The effect of the Privy Council Judgment and PC Order was to give affirmative answers to each of the three questions in the Certificate Issue and to confirm the affirmative answers given by the EC Court of Appeal and Bannister J to each of the two parts of the Good Consideration Issue.

14.     Turning to Mr Moss's second ground, the *ratio decidendi* of the EC Court of Appeal on the Good Consideration Issue is expressed in the statement that I quoted in the First Mortimore Declaration (¶ 24):

> "*I agree with the [PI Defendants] that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the [PI Defendants], in my view,*

---

[6] The lower court may remain the source of *res judicata* concerning any point not appealed. The cases noted in footnote 2 to ¶ 13 of the Second Moss Declaration are all cases where the court held that it was wrong to apply to the lower court to challenge the decision of the appellate court, which is not an issue that arises on the claims brought by the Funds in this Court.

> *having fully performed their part of the contract, gave good consideration which defeats Sentry's restitutionary claim*."

That decision must be followed by the BVI Supreme Court unless the Privy Council Judgment amounts to a contrary determination, or, although not expressly overruled, that decision cannot stand with the Privy Council Judgment.[7] The Privy Council Judgment does not criticise, still less expressly overrule, the EC Court of Appeal judgment. Nor is it the case that the EC Court of Appeal judgment cannot stand with the Privy Council Judgment.

15.     At ¶ 15 of the Second Moss Declaration, Mr Moss says that the reasoning of the EC Court of Appeal on the Good Consideration Issue was rejected by the Privy Council. I do not agree. If the Privy Council had taken such an adverse view of the judgment of the EC Court of Appeal, Lord Sumption, who gave the judgment on behalf of the Privy Council, would have made that clear; but he did not do so. The judgments of the EC Court of Appeal and Lord Sumption both hold that good consideration is given where shares are surrendered against payment of the amount that the Fund was obliged to pay, which was the amount determined by the directors (see Privy Council Judgment at § 19). Lord Sumption rejected the Funds' argument that "*determined in accordance with Article 11*" meant the NAV had to be correctly determined, so as to allow the Fund an indefinite time to reopen the subscription or Redemption Price (at §§ 22-23). That ruling is consistent with the judgment of the EC Court of Appeal. The difference between the two judgments lies in the different approach to what constitutes a certificate under Article 11. Lord Sumption explained that, since the subscription price and Redemption Price must be definitively ascertained at the time of redemption or subscription, certain ordinary transaction documents constituted certificates for the purposes of Article 11 and were therefore conclusive (at § 24). Lord Sumption went on to explain that the requirement of finality and the need to avoid capriciousness on the part of the directors meant there must

---

[7] *Halsbury's Laws of England* (5th ed, 2015) Volume 11 at §30.

always be a binding certificate, recording the directors' determinations of NAV (at § 26). Lord Sumption's conclusions regarding certificates confirm my opinion that Citco's alleged bad faith is irrelevant and that the Funds are bound by anything that purports to be a certificate (see Section 3 below). The consequence of Lord Sumption's conclusions is that the scenario considered by the EC Court of Appeal (*i.e.* absence of certificates) could never occur. But if it had occurred, the reasoning of the EC Court of Appeal, as quoted above, which is consistent with § 19 of Lord Sumption's judgment, remains valid and intact.

16.    I therefore disagree with the Second Moss Declaration (¶ 17), where Mr Moss says that if no certificate had been issued, the redeeming shareholder would have had "*no right to be paid anything other than the redemption amount calculated by reference to the true NAV.*" Mr Moss's opinion assumes a situation which, for the reasons explained by Lord Sumption, could not have occurred. If, however, the situation assumed by Mr Moss did occur, the Funds would have no right of recovery, because, as the EC Court of Appeal held, each redeeming shareholder would have given good consideration by surrendering its shares in return for the Redemption Price, which the Funds were obliged to pay, since it was based on the NAV determined by the directors, however that determination was manifest. Further, the strong policy argument against the subsequent reopening of the amount so determined, perhaps long after the transaction had been completed, applies, and the redeeming shareholder who gave good consideration by surrendering its shares cannot be restored to its original position. Mr Moss's argument amounts to saying that payment of the Redemption Price was merely a provisional payment, which could be revised by the Funds at any time thereafter, even perhaps years later. But there was no hint that the published certificates of NAV were provisional. On the contrary, the certificates were published to subscribers and redeemers on the basis that they could rely on the certificates in order to inform their investment decisions.

17.     It follows from what I have said above and in the First Mortimore Declaration (¶¶ 28-36) that I do not agree with ¶ 18 of the Second Moss Declaration. In this paragraph, Mr Moss also takes issue with the First Mortimore Declaration (¶¶ 68-69), where, after considering cause of action and issue estoppel and the *Henderson v Henderson* principle, I expressed the opinion that the Funds are bound by those affirmative answers on both parts of the Good Consideration Issue. For the reasons given below, I remain of that opinion.

## 2.     BARS TO RE-LITIGATION UNDER BVI LAW

18.     In the First Mortimore Declaration (¶¶ 42-53), I explained BVI law on cause of action and issue estoppel (the two aspects of the substantive rule of estoppel by *res judicata*), which share the same rule about privity of parties[8] and similar rules about taking new points, and went on to consider the procedural rule, known as the *Henderson v Henderson* principle (¶¶ 54-56). On reflection, it would have been clearer if I had addressed cause of action estoppel and issue estoppel separately, as I do below.

### (1)     Cause of action estoppel

19.     In the First Mortimore Declaration (¶ 42), I said that "*Cause of action estoppel is a rule of substantive law that precludes a party from challenging the same cause of action in subsequent proceedings,*" and supported that opinion with quotations from the judgment of Lord Sumption in *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd.*[9] Even if, as Mr Moss opines (Second Moss Declaration at ¶¶ 22-25), cause of action estoppel does not prevent the Funds from bringing the Common Law Claims in the US Proceedings, since the Redemption Payments targeted in the US Proceedings occurred at different time periods than the Redemption Payments in the BVI Redeemer Proceedings (including the claims in those proceedings against the PI Defendants) and are therefore not for the same causes of action, that

---

[8] Mr Moss agrees; see Second Moss Declaration at ¶ 36.

[9] [2014] AC 160, UK Supreme Court.

would not achieve anything for the Funds, because the separate principles of issue estoppel and *Henderson v Henderson* abuse of process prevent them from bringing the Common Law Claims.

### (2)    Issue Estoppel

20.    Mr Moss and I are agreed that the principle is stated by Lord Sumption in the *Virgin Atlantic* case:

> *"Fourth, there is the principle that even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties."*[10]

I understand Mr Moss to agree that issue estoppel is a rule of substantive law.[11] The Defendant Institutions rely on the decisions on the Preliminary Issues in the BVI Redeemer Proceedings, which determined issues that are necessarily common to the US Proceedings, as establishing an absolute bar to the US Proceedings, subject to the Court's determining in their favour the two points on which Mr Moss and I disagree; namely, (a) privity of interest,[12] and (b) relevant points not raised in the earlier proceedings (*i.e.* the new point about the effect of Citco's alleged bad faith).

### (a)    Privity of interest

21.    The issue here is whether the Defendant Institutions who were not PI Defendants, or any of them, have privity of interest with the PI Defendants in the subject matter of the BVI Redeemer Proceedings, in which the Preliminary Issues were determined, so as to

---

[10] At § 17, which is quoted in the First Mortimore Declaration at ¶ 43 and in the Second Moss Declaration at ¶ 35. At § 20, Lord Sumption quoted from the speech of Lord Keith in *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 105, where Lord Keith described issue estoppel in these terms: "*Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant and one of the parties seeks to re-open that issue.*"

[11] Second Moss Declaration at ¶ 10 and ¶ 38, where Mr Moss makes the point that he agrees with me that *Henderson v Henderson* is a procedural rule.

[12] The Second Moss Declaration at ¶ 36 states that, in the context of issue estoppel, the meaning of privity is the same as its meaning in relation to cause of action estoppel, which Mr Moss discusses at ¶¶ 26-33. I agree that the meaning of privity is the same in both cases.

make it just for the decisions on the Preliminary Issues to be binding as between them and the Funds.[13] Mr Moss and I are agreed that helpful statements of what is required to establish privity of interest are to be found in the judgments of Sir Robert Megarry V-C in *Gleeson v J Wippell & Co Ltd*[14] and Floyd LJ in *Resolution Chemicals Ltd v H Lundbeck A/S*,[15] which we both quote.[16]

22.    Mr Moss refers to various ways in which privity of interest can be established (Second Moss Declaration at ¶ 29), some of which are not relevant, but he does refer to the *House of Spring Gardens* case, discussed below and on which the Defendant Institutions rely. In my opinion, the Defendant Institutions have privity of interest with the PI Defendants in the BVI Redeemer Proceedings in which the Preliminary Issues were determined if they come within the statement of Floyd LJ in the *Resolution Chemicals* case, which I quoted in the First Mortimore Declaration (¶ 47) and which for convenience I will quote again:

> "*One type of case where privity is recognised is where C knows of proceedings between A and B in which his rights are being tested but stands back and does nothing.*"[17]

23.    I should make three points about that passage. First, it derives from a strong line of authority discussed by Floyd LJ.[18] The most important of these cases is the decision of the English Court of Appeal in *House of Spring Gardens Ltd v Waite*.[19] In this case, a judgment had been obtained in Ireland against three joint tortfeasors (A, B and C), under which they were jointly and severally liable. A and B brought a separate action in Ireland, seeking to set aside the judgment against them on the ground of fraud. This action was dismissed. When the

---

[13] This formulation derives from the judgment of Sir Robert Megarry V-C in *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, 515, English High Court.

[14] [1977] 1 WLR 510, 515.

[15] [2013] EWCA Civ 924 at §32, English Court of Appeal.

[16] First Mortimore Declaration at ¶¶ 46, 49 and Second Moss Declaration at ¶¶ 27, 28.

[17] [2013] EWCA Civ 924 at § 26.

[18] At §§ 26-28.

[19] [1991] 1 QB 241.

plaintiffs enforced the Irish judgment in England against A, B and C, C challenged the validity

of the Irish judgment on the ground of fraud. His challenge was dismissed, because he was

estopped by the dismissal of the separate action brought in Ireland by A and B. In the words of

Stuart-Smith LJ:

> "*... he was content to sit back and leave others to fight his battle, at no
> expense to himself. In my judgment that is sufficient to make him privy
> to the estoppel ...*"[20]

In stating that proposition, Stuart-Smith LJ relied on earlier Privy Council and English

authority,[21] which showed that such a principle was not restricted to cases of wills and

representative actions, but was of general application where justice and common sense required

it. That was the case before the English Court of Appeal, because C could have joined in the

second action in Ireland, and, if that action had succeeded, either the original judgment would

have been set aside by the Irish court or the plaintiff would have been prevented from enforcing

it in England by a plea of estoppel or abuse of process.[22]

24.     Second, the estoppel described by Floyd LJ is consistent with cases on abuse of

process. Where, as a matter of case management, the court decides to take one or more test

cases to dispose of many cases before it which raise the same issue or issues, an attempt by a

party in one of the other cases to challenge the decision in the test cases will be dismissed as

an abuse of the process.[23]

25.     Third, a critical phrase in the passage quoted in paragraph 22 above is "*his rights

are being tested.*" Where that is the case, there is, in the words of Sir Robert Megarry V-C, "*a*

---

[20] At page 254A-B. The other members of the Court of Appeal agreed.

[21] See page 252G-253F.

[22] At page 253G, Stuart-Smith LJ said: "*The judgment against them was joint and several. If [A and B's] action
to set aside [the Irish] judgment had succeeded, that judgment would have been set aside in toto, not just
against [A and B]; it obviously could not stand. Even if (which I do not accept) the judgment against [C] did not
automatically fall in the event of [A and B] succeeding, it is plain that in the English proceedings the plea of
estoppel or abuse of process would have prevented the plaintiffs pursuing the claim on [the Irish] judgment
against [C].*"

[23] *Ashmore v British Coal Corporation* [1990] 2 QB 338, English Court of Appeal.

*sufficient degree of identification*" between the parties in the proceedings where the issue was determined and the non-party to make it just for the latter to be bound by the decision in those proceedings. It is not enough that the non-party merely has a business or commercial interest in the outcome of the proceedings, as was the case in both *Gleeson* and *Resolution Chemicals*. In *House of Spring Gardens*, C knew that his rights and liabilities under the Irish judgment were being tested by A and B's application in the second Irish action, but did nothing, leaving A and B and plaintiffs to fight out the issue among themselves. There was thus "*a sufficient degree of identification*"[24] between the defendants to make it just for C to be bound by the outcome of the second action in Ireland.

26.     Similarly, where the rights and liabilities of members who redeemed shares under a common procedure under a company's articles are tested in a proceeding between the company and one member (A), there is a sufficient degree of identification between A and the other redeemers (B and C) to make it just for B and C to be bound by the result if they are made aware of the proceedings between the company and A and have the opportunity to participate, but stand back and allow the proceedings against A to take their course. The position is the same, if not stronger, where the court stays the proceedings against B and C, pending the outcome of the proceeding against A, and thereby prevents B and C from testing their rights against the company. It should be noted that in this case, regardless of whether B and C have distinct business and commercial interests from A, they all have a common interest in the outcome of the case against A, since it will determine their rights and liabilities as against the company.

27.     Mr Moss and I agree that issue estoppel must be mutual in the sense that it must apply whatever the decision in the earlier proceedings.[25] Where that is the case, the decision in

---

[24] The *Gleeson* case at page 515.

[25] First Mortimore Declaration at ¶ 46 (last sentence) and Second Moss Declaration at ¶ 32.

the earlier proceedings "*ought fairly and truly to be said to be in substance a decision against him.*"[26]

28.     It seems clear that Mr Moss accepts that the decisions on the Preliminary Issues create an issue estoppel between the Funds and the PI Defendants, subject to the proposed amended allegations regarding Citco's alleged bad faith (Second Moss Declaration at ¶¶ 50-51). On the other hand, Mr Moss does not agree with me that issue estoppel arises from the decisions on the Preliminary Issues as between (a) the Funds and defendants to the BVI Redeemer Proceedings who were not PI Defendants, and (b) the Funds and defendants to the US Proceedings who were not PI Defendants.[27]

29.     It may be of assistance if I outline the factors that a BVI Court would regard as relevant when deciding whether there is sufficient privity of interest between the PI Defendants and the other defendants to the BVI Redeemer Proceedings and the US Proceedings to make it just for them and the Funds to be bound by the outcome of the Preliminary Issues in accordance with the principles described in paragraph 26 above.

(a)     At the time the PI Order was made, 33 claims against 74 BVI Defendants had been issued[28] and 229 actions had been commenced in the US Proceedings against various defendants, including the Defendant Institutions.[29]

---

[26] The *Gleeson* case at page 516; *House of Spring Gardens* at page 253F-H.

[27] First Mortimore Declaration at ¶¶ 51-53 and Second Moss Declaration at ¶¶ 46-48 and 49(C).

[28] Mr Hare's Declaration at ¶ 20.

[29] Liquidators' Opposition to Certain Defendants' Motion to Dismiss on Grounds of *Forum Non Conveniens*, *Fairfield Sentry Ltd. (In Liquidation) v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03496 (SMB) (Bankr. SDNY Apr. 6, 2017) (Dkt. No. 1406), at 11. Appendix A to the Defendants' memorandum of law dated 13 January 2017 (the "**Defendants' Memorandum**") shows that claims have been commenced against 419 Defendant Institutions.

(b)     The BVI Court had jurisdiction to try all the Common Law claims made in the US Proceedings as well as the claims made in the BVI Redeemer Proceedings (see paragraph 234 below).

(c)     It would have been exceptionally burdensome on the BVI Court to determine all the BVI Redeemer Proceedings as separate matters. The PI Order was made in furtherance of the overriding objective of the BVI Court to deal justly with cases, including saving expense, ensuring that cases are dealt with expeditiously and allocating to the BVI Redeemer Proceedings an appropriate share of the BVI Court's resources, while considering the need to allot resources to other cases.[30]

(d)     The BVI Court ordered the determination of the Preliminary Issues because they were common to all the BVI Redeemer Proceedings, being based on the Funds' Articles, which determined the common redemption procedure, and common form documentation relating to notification of the Funds' NAVs.

(e)     The Preliminary Issues were framed so that they applied generally as between the Funds and all redeeming or redeemed members, not just the PI Defendants.[31]

(f)     In exercise of its duty to actively manage the BVI Redeemer Proceedings, the BVI Court ordered that (i) the Preliminary Issues be determined first, (ii) notice of the PI Order be given to all BVI

---

[30] The Eastern Caribbean Supreme Court Rules 2000 ("**BVI CPR**"), Rule 1.1. These rules apply to proceedings in the BVI Court other than, among other things, insolvency proceedings (including the winding up of companies) (Rule 2.2), for which there are separate rules. The BVI CPR are modelled on the English Civil Procedure Rules ("**English CPR**"). By Rule 4 of the BVI Insolvency Rules 2005 ("**BVI IR**"), the BVI CPR applies to insolvency proceedings, except so far as inconsistent with the BVI Insolvency Act, BVI IR or practice direction made under Rule 8 of the BVI IR.

[31] Mr Hare's Declaration at Exhibit N.

Defendants so that they would have the opportunity to participate in the

Preliminary Issues, and (iii) the BVI Redeemer Proceedings listed in the

PI Order and all the other BVI Redeemer Proceedings be stayed until

after the determination of the Preliminary Issues.[32]

(g)    The order made in this Court staying the US Proceedings pending the

determination of the Preliminary Issues was made after and with

knowledge of the PI Order, as well as the outcome of the trial before

Bannister J and his summary judgment order.[33]

(h)    The requirement of mutuality was satisfied. If the Funds had succeeded

on the Preliminary Issues, a BVI Court would not have permitted any

Defendant Institution who had been notified of the PI Order to challenge

that result.

30.    Furthermore, it makes no difference to the privity issue that the Citco Subscriber

and/or the Citco Record Subscriber may have been agents and/or trustees for certain Defendant

Institutions. This is because, for the purposes of issue estoppel, the principal or beneficiary has

privity of interest with his agent or trustee.[34]

(b)    *The new point about the effect of bad faith on the conclusiveness of certificates*

31.    In the First Mortimore Declaration (¶ 43), I quoted a passage from the judgment

of Lord Sumption in the *Virgin Atlantic* case that explains the impact of issue estoppel on points

not raised in the earlier proceedings, which I will set out again, underlining the relevant phrases.

"*Except in special circumstances where this would cause injustice, issue
estoppel bars the raising in subsequent proceedings of points which (i)*

---

[32] BVI CPR 25.1, 26.1(2)(d), (e), (g), (q). See First Mortimore Declaration at ¶ 18. The BVI CPR include rules
about representative parties (BVI CPR 21). I agree with footnote 16 to ¶ 43 of the Second Moss Declaration that
none of the BVI Redeemer Proceedings was a representative action under those rules. The BVI CPR do not
include formal rules for Group Litigation Orders and test cases, as are found in the English CPR 19.10-15.
However, the case management PI Order achieves a similar result.

[33] First Mortimore Declaration at ¶ 23.

[34] In relation to trustees and beneficiaries: *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, 515.

*were not raised in the earlier proceedings or (ii) were raised but unsuccessfully. If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised.*"[35]

32.     In response, Mr Moss raises two arguments (¶ 37). First, he says that issue estoppel only arises if the issue was actually determined in the earlier proceedings. In support of this, Mr Moss cites *Sun Life Insurance v Lincoln National Life Assurance*,[36] where the Court of Appeal distinguished an issue actually decided in arbitration proceedings, to which issue estoppel would have applied, from a mere *obiter dictum* or incidental point, to which issue estoppel did not apply.

33.     To see whether Mr Moss's first argument applies or whether the matter is covered by Lord Sumption's judgment, it is necessary to determine what was decided by the Privy Council on the Certificate Issue. The issues so decided were that (i) certain documents were certificates within Article 11 and therefore have conclusive effect, and (ii) publication or delivery of them to a member precludes the Funds from asserting that money paid to that member upon redemption exceeded the true Redemption Price and that such excess is recoverable from the redeemed member. Those decisions therefore resolved the status of the documents as conclusive certificates and stated the consequences in relation to the Funds' Restitution Claims. They were not *obiter dicta* or merely incidental to some main decision. Therefore, the issue here was actually determined, such that issue estoppel applies.

34.     Second, Mr Moss says that "*If a party has, for any reason, not raised an issue in the original litigation, there can be no estoppel in relation to it.*" This raises the distinction between (i) a point, which could with reasonable diligence and should have been raised in the earlier proceedings when the court determined the issue said to give rise to issue estoppel to

---

[35] At § 22. This principle derives from the speech of Lord Keith in *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 109.

[36] [2004] EWCA Civ 1660 at §§ 40-44.

which Lord Sumption's statement applies (paragraph 31 above), and (ii) a distinct issue, which is not such a point, which a person may be barred from pursuing under the *Henderson v Henderson* principle, if it could and should have been raised in the earlier proceedings. In the *Virgin Atlantic* case,[37] Lord Sumption indicated what is required of a "point" for the purposes of issue estoppel, when, in relation to cause of action estoppel, he referred to "*all points which had to be and were decided in order to establish the existence or non-existence of a cause of action.*" Applied to the determination of an "issue" in earlier proceedings, the "point" must be one which if it had been advanced and had succeeded would have led to a different outcome. Thus, the point of law as to the issue of interpreting a clause in a lease in *Arnold v National Westminster Bank plc*[38] was a point that the tenant would be barred by issue estoppel from raising in subsequent proceedings, unless, in accordance with the principles decided in that case and affirmed in *Virgin Atlantic*, the court allowed it do so (as it did). If successfully taking the point would have led to a different decision on the issue, the point cannot be treated as a merely incidental point (*Sun Life Insurance*).

35.     Mr Moss cites two cases about distinct issues, not points which were necessary to establish the existence or non-existence of the cause of action in the earlier proceedings or essential to the way an issue was determined in the earlier proceedings. In *Moss v Anglo-Egyptian Navigation Co*,[39] it was held that a plaintiff was not estopped by *res judicata* from bringing a claim for breach of contract in circumstances where an earlier claim for breach of contract had failed, but the new claim was for later breaches. The other case is *Lilly Icos LLC v 8pm Chemists Ltd*,[40] which concerned an inquiry as to the damages to which the defendants

---

[37] At § 22. The *Virgin Atlantic* case was one of "*true cause of action estoppel*"; see § 27.

[38] [1991] 2 AC 93, English House of Lords.

[39] (1865) LR 1 Ch App 108, 114-116, English High Court. See the explanation of the case in *Spencer Bower & Handley, Res Judicata* (4th ed, 2009) at §§ 7.12, 8.17, 17.30.

[40] [2009] EWHC 1905 (Ch), English High Court.

were entitled under cross-undertakings in damages given by the claimants when they obtained

an order from Mann J, at an interim hearing, continuing injunctions against the defendants to

restrain trademark infringement. At that hearing, Mann J also dismissed an application by the

defendants for summary judgment. On the defendants' appeal, the Court of Appeal found that

the claimants did not have a sustainable claim for trademark infringement, gave summary

judgment in favour of the defendants and set aside the injunctions. On the inquiry as to damages

before Arnold J, the claimants argued, among other things, that the defendants were not entitled

to damages since they conducted an unlawful business. Arnold J rejected this argument on the

merits and then went on to deal briefly with other grounds relied on by the defendants as to

why the claimants could not raise the illegality issue, one of which was that they were estopped

from doing so by Mann J's judgment. Arnold J disposed of that at § 303, in the passage quoted

by Mr Moss. The illegality issue was plainly distinct from, and would not have affected the

outcome of, the issues that Mann J had to decide; namely, whether the claimants had a properly

arguable claim for trademark infringement and, if so, whether the interim injunction should be

continued.

36.    The argument that if certificates were issued in bad faith they would not be

conclusive and that the Funds could recover payments to the extent they exceeded the true

Redemption Price was a point of law which, if it had been raised in the Funds' skeleton

arguments and oral submissions and accepted by the court, would have led to Preliminary

Issues 3 and 4 being decided differently,[41] in that the answers to those issues would have had

to include a proviso to this effect: "*provided the documents were given in good faith.*" In this

connection, it is important to note that the wording of the PI Order was deliberately broad to

cover all documents that might be certificates and all redemptions, so that the effect of bad

---

[41] See the PI Order in Exhibit N to Mr Hare's Declaration (summarised at ¶¶ 18(a)(iii) and (b)(ii) of the First
Mortimore Declaration).

faith was not only within the scope of the PI Order, but plainly material to the outcome. I should

add that, as a point of law, the effect of bad faith could have been raised, without any significant

additional costs, not just before Bannister J, but also before the EC Court of Appeal and the

Privy Council, if sufficient notice had been given.

37.    Under BVI law, there are therefore two questions for the Court to consider:

(i) whether the Funds could with reasonable diligence have raised the point about the effect of

bad faith in the Preliminary Issues, and (ii) if so, whether in all the circumstances the point

should have been raised.

38.    As to reasonable diligence, the Defendant Institutions have referred to (i) the

action brought in May 2009 by Sentry against one of its directors and certain agents, in which

allegations of bad faith were made,[42] (ii) the August 2010 judgment of the U.S. District Court,

denying the motion to dismiss proceedings by investors against Citco, in which allegations of

bad faith were made against Citco that the court found sufficient to state claims under

applicable U.S. law,[43] (iii) the fact that bad faith was raised by the PI Defendants at the hearing

following which the PI Order was made,[44] (iv) the fact that at that hearing the Liquidators

informed Bannister J that they wanted to examine more than 500,000 pages of documents that

had been delivered to them by Citco,[45] and (v) the concession made on behalf of the Funds in

submissions to the Privy Council.[46]

39.    Against that, at ¶ 57a of the Second Moss Declaration, Mr Moss says that, as a

matter of professional conduct, an allegation of bad faith should not be pleaded in English or

BVI proceedings without a proper basis for doing so. I agree with that, but it does not provide

---

[42] Defendants' Memorandum at page 7.

[43] Defendants' Memorandum at page 7.

[44] First Mortimore Declaration at ¶ 63, citing Exhibit G to Mr Hare's Declaration at § 21 and Exhibit A to Mr Kite's Declaration at ¶ 62.

[45] Bannister J's judgment at § 8 in Exhibit N to Mr Hare's Declaration.

[46] First Mortimore Declaration at ¶ 65, citing Exhibit N to Mr Kite's Declaration at § 6.

an answer to the reasonable diligence question. The Preliminary Issues arose from the BVI Defendants' defences, not from what had been pleaded in the Funds' statement of claim. Paragraph 2 of the PI Order enabled the Funds to make new claims based on facts coming to the knowledge of the Liquidators after the trial of the Preliminary Issues. Therefore, to preserve the ability of the Funds to make claims against redeemed members on the ground that Citco issued documents in bad faith, the Funds should have raised the point about the effect of bad faith on the certificates, so that the issue of whether bad faith made any difference could have been debated and resolved. Instead, not only did the Funds fail to raise the point, but before the Privy Council, they made an unqualified concession that if the documents were found to be certificates within Article 11(1), they would be binding on the Funds.

40.     If the Court finds that the Citco bad faith point could with reasonable diligence have been raised in the Preliminary Issues, as in my opinion it could have, the second question is whether in all the circumstances it should have been raised. Since the Funds now allege that the Citco bad faith point is critical to the conclusiveness of all certificates and applies to all redemptions that are the subject of the BVI Redeemer Proceedings and the US Proceedings, the effect of not raising it during the Preliminary Issues hearings is potentially to render nugatory the decisions made by the BVI Supreme Court and the Privy Council on the Preliminary Issues. That outcome involves a vast amount of wasted costs and time, not just for the parties, but also for the courts. These are factors that I would expect a BVI Court to take into account.

### (3)    *Henderson v Henderson*

41.     In the *Virgin Atlantic* case Lord Sumption said that while *res judicata* and *Henderson v Henderson* abuse of process are juridically different, they are "*overlapping legal*

*principles with the common underlying purpose of limiting abusive and duplicative litigation*."[47] So, it is not surprising to find that they share common legal features.

42.    Mr Moss and I agree on the following points in relation to *Henderson v Henderson* abuse of process:

(a)    it is a procedural, not substantive, rule of BVI and English law;

(b)    it may apply where the parties are different and do not satisfy the standard for privity required for issue estoppel to apply; and

(c)    it may apply where the matter could and should have been raised in the earlier proceedings.[48]

43.    At ¶¶ 38 and 39 of the Second Moss Declaration, Mr Moss says that the decision to dismiss a claim as an abuse under the *Henderson v Henderson* principle is an exercise of discretion. This is not correct; it is now clearly established that the decision is one for the judgment of the court to which, after assessing all the facts, there can only be one correct answer.[49]

44.    At ¶¶ 40 and 41 of the Second Moss Declaration, Mr Moss refers to the recent decision of the English Court of Appeal in *Michael Wilson & Partners v Sinclair*.[50] In simple terms, the Court of Appeal had to consider "*whether it is an abuse of the Court's process for A to claim in legal proceedings against C, on a basis which has been decided against A in arbitration proceedings between A and B?*"[51] In the event, the Court of Appeal held it was not. The judgment of Simon LJ (with whom the Senior President of Tribunals and Patten LJ agreed)

---

[47] At § 25.

[48] First Mortimore Declaration at ¶ 54; Second Moss Declaration at ¶¶ 38, 39, 42.

[49] *Aldi Stores Ltd v WSP Group plc* [2008] 1 WLR 748 at § 16, English Court of Appeal; *Stuart v Goldberg Linde* [2008] 1 WLR 823 at § 24, English Court of Appeal; *Michael Wilson & Partners v Sinclair* [2017] EWCA Civ 3 at § 48 at (6), English Court of Appeal.

[50] [2017] EWCA Civ 3.

[51] At § 13.

contains a summary of what he described as "*themes*" that emerge from the cases about abuse

of process that were relevant to the appeal before him. I should make two points about the

themes quoted by Mr Moss. First, in relation to theme (2), which is that "*[a]n abuse may occur*

*where it is sought to bring new proceedings in relation to issues that have been decided in*

*prior proceedings*," there is a significant difference between (i) the case considered by Simon

LJ, where the new proceedings are commenced after the issue had been determined in the

earlier proceedings, and (ii) the other BVI Redeemer Proceedings and the US Proceedings,

which had been commenced before the PI Order and were stayed by the BVI Court and this

Court to await the eventual outcome in the Privy Council of the Preliminary Issues. This is

because, in the latter case, the court has already decided that the outcome of the case that

proceeds will be, or is likely to be, determinative so that the parties and the court should not be

troubled with further duplicative litigation. Second, in relation to theme (5), which is that "*[i]t*

*will be a rare case where the litigation of an issue which has not previously been decided*

*between the parties or their privies will amount to an abuse of process*," the stay of proceedings

for test cases to proceed in *Ashmore v British Coal Corporation*[52] is an example of proceedings

being dismissed as abusive in just such circumstances.

45.     Mr Moss does not mention Simon LJ's first theme:

> "*In cases where there is no res judicata or issue estoppel, the power to*
> *strike out a claim for abuse of process is founded on two interests: the*
> *private interest of a party not to be vexed twice for the same reason and*
> *the public interest of the state in not having issues repeatedly litigated*
> *... These interests reflect unfairness to a party on the one hand, and the*
> *risk of the administration of public justice being brought into disrepute*
> *on the other ...*"[53]

Simon LJ's statement about the interests of the parties is supported by his theme 4(b), referring

to relitigation being "*manifestly unfair to a party.*"[54] If the BVI Court concluded that the legal

---

[52] [1990] QB 338.

[53] *Michael Wilson & Partners v Sinclair* [2017] EWCA Civ 3 at § 48 at (1).

[54] At § 48 at (4)(b).

effect of bad faith on the certificates could and should have been raised in the Preliminary

Issues hearings, it would be manifestly unfair for the PI Defendants and the other Defendant

Institutions that waited for them to be resolved to relitigate the conclusiveness of the

certificates. Moreover, the failure by the BVI Court and the EC Court of Appeal to finally

resolve the Preliminary Issues and the conclusiveness of the certificates, induced by the Funds'

failure to take the bad faith point, would bring BVI public justice into disrepute.

46.     In ¶ 43 of the Second Moss Declaration, Mr Moss expresses the opinion that a

litigant does not have a duty to "*uncover facts which might support additional claims or

arguments.*"[55] The case relied on by Mr Moss shows that, while Mr Moss's opinion may be

correct in many cases, what a litigant or potential litigant should do depends on the

circumstances.[56] Here, as I have said, the BVI Court made the PI Order to resolve issues of

principle that affected many claims by the Funds in the BVI and the United States against

redeemed shareholders. As officers of the BVI Court,[57] with conduct of a large and complex

insolvent estate, the Liquidators would be expected to do everything they could to assist the

BVI Court in resolving issues as efficiently as possible for the benefit of all those interested in

the estate. That would involve bringing to the BVI Court's attention all points that could affect

the outcome of the Preliminary Issues, including any point of law that might benefit the Funds,

if the Liquidators became aware of sufficient facts to support it.

47.     Turning briefly to what Mr Moss says about the application of the *Henderson v

Henderson* principle to the circumstances of this case, at ¶ 56 he says that he is "*not aware of

any case in which there has been held to be such an abuse merely because a similar claim or

issue has been determined as against that litigant in proceedings against a different party.*"

---

[55] Citing *Stuart v Goldberg Linde* [2008] 1 WLR 823 at §§ 53, 59 and 70.

[56] *Stuart v Goldberg Linde* at § 59.

[57] Section 184 of the BVI Insolvency Act.

There is always more than that to a successful application. Simon LJ's first theme (paragraph 45 above) shows that the foundation of the *Henderson v Henderson* abuse principle is protecting the parties from unfairness and/or the reputation of public justice. Thus, in *Taylor Walton v Laing*,[58] a litigant had failed in proceedings against another party to a written agreement and then sued his solicitor who had drafted the agreement for negligence. The claim against the solicitor was struck out as an abuse, because, in the circumstances of the case, it necessarily involved arguing that the decision in the first case was wrong. The *House of Spring Gardens* case was also decided on abuse grounds, the Court of Appeal pointing out that if the plaintiff had lost the second action in Ireland, it would have been an abuse of process for the plaintiff to have brought proceedings against C in England to enforce the original Irish judgment. The BVI Court would derive assistance from the *Ashmore* case, noted in paragraph 24 above, where the defendant was subject to many industrial tribunal claims, some of which were allowed to proceed on the basis that the decisions in these sample cases would be persuasive, but not binding, on the other claimants. The sample claims failed and when one of the other claimants pursued her claim, it was dismissed as an abuse of the process, because it would be unfair to the other parties to re-open the issues and would bring the administration of justice into disrepute.

48.    At ¶ 57 of the Second Moss Declaration, Mr Moss gives three reasons why the Funds could not and should not have taken the bad faith point. Reason (a) is that the Liquidators lacked sufficient material to allege that Citco had acted in bad faith. That issue was within the scope of the PI Order and I refer to what I have said in paragraph 38 above about the matters relating to Citco's alleged bad faith of which the Liquidators were aware at the time. Reason (b) concerns paragraph 2 of the PI Order (quoted in the First Mortimore Declaration at ¶ 60), which as Mr Moss contends is concerned with factual matters, not points of law within the

---

[58] [2007] EWCA Civ 1146, English Court of Appeal, referred to in the *Michael Wilson* case at § 46.

scope of the PI Order. This reason is incorrect for the reasons discussed at paragraphs 31-40 above. Reason (c), under which Mr Moss argues that it would not be abusive to raise different arguments in relation to different redemptions, fails to take account of the wording of the PI Order, which was not limited to the redemptions of the PI Defendants, but applied to claims by the Funds against any redeeming or redeemed member. Even assuming that there is no issue estoppel here, the circumstances of these cases are at least as strong a case of *Henderson v Henderson* abuse as the *Ashmore* case, given that the PI Order was intended to provide answers to all claims to recover Redemption Payments, whereas the decisions in the cases that went forward in *Ashmore* were merely persuasive.

49.    There is one further point I should make about the relevance to *Henderson v Henderson* abuse of the PI Order and the stay of proceedings in that order and the later stay order made by this Court. Those orders were a means of overcoming oppression on defendants who were subject to multiple claims in different jurisdictions and of avoiding the administration of justice being brought into disrepute by inconsistent decisions being made in different cases in different jurisdictions. In *Barrow v Bankside Agency Ltd*, Sir Thomas Bingham MR said of the rule in *Henderson v Henderson*:

> "*It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed.*" [59]

---

[59] [1996] 1 WLR 257, 260A-C, English Court of Appeal.

The rationale of *Barrow* plainly applies here and would lead a BVI Court to bar the Funds' Common Law Claims against the Defendant Institutions as an abuse under the *Henderson v Henderson* principle, having regard in particular to the fact that the Liquidators chose to cause the Funds to bring the BVI Redeemer Proceedings against the PI Defendants and the other BVI Defendants in the BVI, where they established jurisdiction over them. The Funds could and should have brought in the same proceedings all their Common Law Claims against the PI Defendants and the other BVI Defendants and they could equally have brought their Common Law Claims against the other Defendant Institutions in the BVI (paragraph 234 below).

**3.      IRRELEVANCE OF CITCO'S ALLEGED BAD FAITH**

50.      I will consider Mr Moss's response in relation to the issues about Citco's alleged bad faith under three headings: (i) interpretation of Article 11(1), (ii) agency issues, and (iii) taking advantage of one's own wrong. In summary, even if Citco issued the certificates in bad faith, under BVI law the Funds are still bound by those certificates, because they purport to have been issued under Article 11 and therefore have conclusive effect, and the Funds are bound by the acts of its agent and are not permitted to avoid the conclusiveness of the certificates by relying on their own wrong.

**(1)      Interpretation of Article 11(1)**

*(a)      The Weavering and Kingate Cases*

51.      In the First Mortimore Declaration (¶¶ 70-74), I referred to the decision of the Cayman Islands Court of Appeal in the *Weavering Case* as authority for the proposition that, where a company's articles contain a provision for binding valuations, it is not permissible to reopen a NAV retrospectively on the ground of fraud, whether or not the company was complicit in it.[60]

---

[60] See the *Weavering* article quoted in the First Mortimore Declaration at ¶ 71 and the conclusion quoted in ¶ 73.

52.     Mr Moss discusses this case in the Second Moss Declaration (¶¶ 62-68) and draws different conclusions. I will not take up time commenting on all the differences between us, but I do need to address Mr Moss's major point about contractual interpretation. He says that Weavering's article 34 is distinguishable from the Funds' Article 11, because it does not expressly mention "*good faith*."[61] As regards contractual interpretation, Mr Martin QC, giving the judgment of the Cayman Islands Court of Appeal, made two points: (i) the Funds' articles were "*different in form from, but in substance the same as*" Weavering's articles;[62] and (ii) to achieve certainty and avoid the practical problems mentioned by Lord Sumption in § 23 of the Privy Council Judgment, Weavering's article 34 should be construed so that Weavering was bound by "*a valuation purportedly made in compliance with the articles*" (the "**Purported Compliance Interpretation**").[63]

53.     In ¶ 69, Mr Moss refers to the *Kingate Case* in the Supreme Court of Bermuda, which concerned a claim by another BLMIS feeder fund to recover management fees paid to its administrator and distributed to the other defendants, on the ground that the defendants were unjustly enriched by the mistaken payment of excessive fees, as revealed by the exposure of the BLMIS fraud. As summarised in Hellman J's judgment, Kingate's article 58 provided that valuations made pursuant to the articles were to be binding on all persons "*in the absence of bad faith or manifest error*."[64] In spite of the difference in language between this article and the Funds' Article 11, Hellman J held that the articles of Kingate and the Funds were

---

[61] Second Moss Declaration at ¶¶ 65, 66, 68. The Weavering article 34 is quoted in the First Mortimore Declaration at ¶ 71 and the relevant part of the Funds' Article 11 is quoted in the First Mortimore Declaration at ¶ 75. The quotation from Weavering's article 34 in the Second Moss Declaration at ¶ 65 is inaccurate, because it refers to "*parties,*" when it should refer to "*persons.*"

[62] The *Weavering Case* at § 27, as noted in the First Mortimore Declaration at ¶ 72(a).

[63] The *Weavering Case* at § 29, as noted in the First Mortimore Declaration at ¶ 72(c).

[64] The *Kingate* judgment at §§ 6, 42, 47, 57. In the Second Moss Declaration at ¶ 69, Mr Moss appears to quote from clause 4.2 of an administration agreement (see the *Kingate Case* at § 57), which may not be in precisely the same terms as Kingate's article 58.

indistinguishable.[65] As Mr Moss points out, Hellman J accepted the submission that the only circumstances in which the valuations would not be binding would be bad faith or manifest error.[66] In the *Kingate Case*, unlike *Weavering*, there was no issue about bad faith, so it was not necessary for the parties or the court to address what would have been the position if there had been bad faith (and in particular which party could rely on bad faith) and Hellman J's observations about bad faith were *obiter dicta*.

54.    In my opinion, the Cayman Islands Court of Appeal in *Weavering* was right to hold that the presence or absence of a reference to good faith made no substantial difference to the interpretation of Weavering's articles and the Funds' Articles. This is supported by the points I made in the First Mortimore Declaration at ¶¶ 78-82 and by two well-established principles of English and BVI law. One principle is that where a valuation, involving the exercise of discretion or judgment, is to be undertaken by one of the parties (whether acting by himself, his officers or agents), that party is subject to a duty to act in good faith (see paragraph 68 below). The other principle is that, where parties agree that a valuation made by an independent third party shall be conclusive and binding, the valuation is not binding if it is not made in good faith.[67] Therefore it would have been open to a subscriber to, or redeemer from, a Fund to say that he is not bound by a certificate if it was not given in good faith, even if good faith had not been expressly mentioned in Article 11(1).

55.    Reverting to the question of how the articles should be interpreted in relation to a claim that the company is not bound by a valuation given on its behalf in bad faith, Mr Martin QC gave a clear answer in the *Weavering Case*, when he held that the Purported Compliance Interpretation applied to Weavering's article 34. This meant that Weavering was obliged to pay

---

[65] The *Kingate Case* at § 76.

[66] The *Kingate Case* at § 108; also § 81.

[67] *Jones v Sherwood Computer Services Ltd* [1992] 1 WLR 277, English Court of Appeal.

redemptions based on the fraudulent valuations (based on fictitious values concealed by its own investment manager) and that, because it could not pay all the redemptions, it was unable to pay its debts and the official liquidators could recover redemption payments made to SEB as unfair preferences. Mr Martin QC's holding about the interpretation of Weavering's article 43 was part of the *ratio decidendi*, was correct, in my opinion, and would be followed by a BVI Court. In contrast, Hellman J's observations on this aspect of interpretation were *obiter dicta*, do not bind the BVI Court, and would not be followed.

    *(b)*    *Interpretation of the Funds' Article 11(1)*

56.    Mr Moss appears to interpret the phrase "*any certificate … given in good faith by or on behalf of the Directors shall be binding*" in the Funds' Article 11(1) as if being given in good faith were a condition precedent to a certificate being binding, with the consequence that the Funds are not bound by a certificate given in bad faith.[68] He interprets the Article as if it said "*if, but only if, given in good faith by or on behalf of the Directors*." This interpretation conflicts with Mr Martin QC's Purported Compliance Interpretation, under which, as applied to Article 11(1), the Funds would be bound by certificates which <u>purport</u> to have been given in good faith in compliance with Article 11(1) and are published or delivered to members. Mr Moss's interpretation also conflicts with the Privy Council Judgment which found that, for the scheme under the Articles to work, there had to be conclusive certificates. The scheme would not work if some certificates were binding and others were not, depending on the good faith or otherwise of the Funds' directors or agents. In my opinion, the Purported Compliance Interpretation should therefore be adopted as the one that is consistent with the Privy Council Judgment and Mr Moss's interpretation should be rejected.

57.    Under English and BVI law, where there are two tenable interpretations of a provision in a contract, neither of which is excluded by the language used, the court takes an

---

[68] Second Moss Declaration at ¶¶ 65, 66, 68, 69, 75.

iterative approach to test the rival interpretations and is entitled to prefer the construction which is consistent with business common sense and to reject the other.[69] Applying those principles to the Purported Compliance Interpretation and Mr Moss's interpretation (assuming Mr Moss's interpretation to be a tenable one), it is my opinion that the former would be preferred as being the one consistent with business common sense. There are several reasons for this.

(a)     The Purported Compliance Interpretation avoids the practical problems mentioned by Lord Sumption in § 23 of the Privy Council Judgment, whereas Mr Moss's does not.[70] This is the point that led Mr Martin QC to adopt his interpretation.

(b)     The Purported Compliance Interpretation achieves the certainty and finality that was essential to the scheme under the Articles (as Lord Sumption stated at § 26). It gives members the commercial certainty that they can rely on certificates of NAV issued from time to time on behalf of the Funds, whereas Mr Moss's interpretation does not.

(c)     Mr Moss's interpretation amounts to a disclaimer, under which the Funds disclaim responsibility for the dishonesty of their own directors or agents. If potential investors appreciated that this was what Article 11(1) meant, they would be discouraged from investing in the Funds' shares, because potential subscribers could not rely on published information about NAV when considering a purchase and they and potential redeemers would have no certainty that they could retain Redemption Payments, without the risk of claw-back claims later being made by the Funds. This would have obvious adverse consequences for

---

[69] *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 at §§ 20, 21, UK Supreme Court; *Wood v Capita Insurance Services Ltd* [2017] 2 WLR 1095 at §§ 11, 12, UK Supreme Court.

[70] This is the same as the reason stated in the First Mortimore Declaration at ¶ 82.

the Funds' businesses. Mr Moss's interpretation is therefore not consistent with business common sense.

(d)    The Purported Compliance Interpretation is consistent with business common sense because the phrase "*given in good faith*" does no more than give the Funds legitimate protection from disputes and claims on the grounds of negligence or innocent misrepresentation by them or their agents.[71]

(e)    The Purported Compliance Interpretation is consistent with the position at common law and under section 31 BCA 2004, under which the Funds are bound by certificates issued by Citco, acting as its agent (First Mortimore Declaration at ¶¶ 75-87 and paragraphs 58-63 below).

(f)    Mr Moss's interpretation does not benefit the Funds, because (i) sections 11 and 31 BCA 2004 prevent that (paragraphs 60-63 below), and (ii) they cannot take advantage of their own wrong (paragraphs 64-83 below).

**(2)    Agency issues**

*(a)    Common law*

58.    In the First Mortimore Declaration (¶¶ 76-77), I expressed the opinion that, at common law, in favour of a third party, such as a redeemer, dealing in good faith with a Fund, the Fund is bound by certificates given by Citco as its agent, acting within the scope of its actual or apparent authority, even though Citco may have been acting in bad faith. This is consistent with the Purported Compliance Interpretation of Article 11(1) and the Privy Council Judgment.

---

[71] First Mortimore Declaration at ¶ 80.

59.     As I read the Second Moss Declaration (¶¶ 70-77), Mr Moss takes issue with my opinion because, on his interpretation of Article 11(1), the Funds are not bound by a certificate issued by Citco if it was issued in bad faith. If the Court accepts the Purported Compliance Interpretation and rejects Mr Moss's interpretation, the legal position is as stated in the preceding paragraph. On the other hand, subject to sections 11 and 31 BCA 2004 (paragraphs 60-63 below) and to the good consideration defence (paragraphs 14-16 above), I would agree that, if (contrary to paragraphs 56 and 57 above) the Court were to adopt Mr Moss's interpretation and find that the certificates were issued in bad faith, the conditions for certificates having conclusive effect would not have been fulfilled and the Funds would not be bound.

*(b)     Section 31 BCA 2004*

60.     In the First Mortimore Declaration (¶¶ 83-85), I expressed the opinion that (i) pursuant to section 31 BCA 2004, the Funds cannot assert that Citco lacked authority to give certificates under Article 11(1) or that such certificates are not valid and genuine, (ii) this is so even if Citco acted in bad faith or fraudulently, and (iii) pursuant to section 11 BCA 2004, the Funds cannot avoid these consequences by relying on the reference to "*good faith*" in Article 11(1). Section 11 thus prevents the Funds from claiming that Redemption Payments were excessive, because that necessarily involves them asserting that they did not comply with the Articles, in that the Redemptions were effected pursuant to Article 10(1)(b)-(c) for the wrong Redemption Prices.

61.     Again, as I read the Second Moss Declaration (¶¶ 78-80), Mr Moss takes issue with my opinion, because he says the issue is not about the validity and genuineness of the certificates for the purposes of subsection 31(1)(e) BCA 2004, but whether, as a matter of interpretation, they give redeemers the contractual right to treat the certificates as conclusive. I disagree; in my opinion, subsection 31(1)(e) applies to the certificates and, read with

section 11, prevents the Funds from contending that the certificates are not valid, as they purported to be, because they were not issued by Citco in good faith.

(a)    The certificates were documents issued on behalf of the Funds by their directors or Citco, as agents, within subsection 31(1)(e).

(b)    The directors or Citco had actual or apparent authority to issue the certificates within subsection 31(1)(e).

(c)    In those circumstances, the Funds are precluded by subsection 31(1)(e) from asserting that the certificates are not valid or genuine. Plainly, the certificates were genuine, in that they were what they purported to be and the Privy Council has found that certain documents were indeed certificates.

(d)    The question then is what is meant by "*not valid*" in subsection 31(1)(e). Validity must mean something different from being genuine and must go beyond questions of authority to issue the document, since those matters are already dealt with in the section. Subsection 31(1)(e) therefore must prevent the company from claiming that a document was invalid because of formal defects. It must also prevent the company from contending that a document is invalid because of the impropriety or bad faith of the agent. That is the statutory context of subsection 31(1)(e), because subsections 31(1)(c) and (d) concern the acts of agents on behalf of the company and subsection 31(2) makes it clear that subsection 31(1) applies, even if the agent has acted fraudulently or forged a document on behalf of the company.

(e)    This interpretation of subsection 31(1)(e) is consistent with the Purported Compliance Interpretation and with the Privy Council

Judgment which held that, for the scheme under the Articles to work, the certificates had to be definitive. For the Funds to contend that a document that purports to be a certificate is not definitive, because it was issued by Citco in bad faith, amounts to saying that the certificate is not valid and did not achieve its purpose under the Articles. Such a contention is barred by subsection 31(1)(e).

(f)     Subsection 11(3) provides that a company's articles are of no effect to the extent that they contravene or are inconsistent with the BCA 2004. If Article 11(1) is interpreted, as Mr Moss does, so that certificates are not valid if issued by Citco in bad faith, it would contravene and be inconsistent with subsection 31(1)(e). That is not permitted and the Purported Compliance Interpretation of Article 11(1) must be adopted.

62.     At ¶ 80 of the Second Moss Declaration, Mr Moss gives the example of an architect's certificate. That example is unhelpful, because the architect is independent and is not the agent of the employer, and thus Section 31 could not apply to such a certificate.

63.     If the Court accepts the Purported Compliance Interpretation and rejects Mr Moss's interpretation, the legal position is as stated in paragraph 60 above. If (contrary to paragraphs 56 and 57 above) Article 11 were to be interpreted in accordance with Mr Moss's interpretation so as to exclude section 31 BCA 2004, it would still be an ineffective disclaimer pursuant to section 11 BCA 2004 and the legal position is as stated at paragraph 60.

**(3)     Taking advantage of one's own wrong**

64.     This issue is addressed in the First Mortimore Declaration (¶¶ 88-92) and the Second Moss Declaration (¶¶ 81-92). We are agreed that there is a principle of BVI and English law that a contract will be interpreted, so far as possible, in such a way as to prevent a party

from taking advantage of its own wrong.[72] For this purpose the contracts to be considered are the Funds' Articles and specifically Article 11(1). If the principle applies, as in my opinion it does, its effect is that the Funds are bound by the certificates issued by Citco, even if Citco gave them in bad faith.[73]

65.    The three areas of difference between Mr Moss and myself are whether under BVI law:

(a)    a term should be implied into the Articles that each Fund, acting through its agent, Citco, would carry out its functions under Article 11(1) rationally and in good faith;

(b)    if Citco acted in bad faith, its bad faith should be attributed to the Fund with the consequence that the Fund would be in breach of the implied term; and

(c)    Article 11(1) should be interpreted so as to prevent the Fund from avoiding the conclusive effect of certificates issued by Citco.

*(a)    Implied term*

66.    In the First Mortimore Declaration (¶¶ 80 and 89), I expressed the opinion that, under BVI and English law, a court would imply a term in each Fund's Articles to the effect set out in paragraph 65(a) above.

67.    Mr Moss and I are agreed that a term will be implied where it is necessary to give business efficacy to the Articles or where the Articles would otherwise "*lack commercial or practical coherence.*"[74]

---

[72] First Mortimore Declaration at ¶ 88 and Second Moss Declaration at ¶ 81.

[73] First Mortimore Declaration at ¶ 92.

[74] Second Moss Declaration at ¶ 82.

68.    In *Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd*,[75] Jackson LJ (with whom Lewison and Beatson LJJ agreed) reviewed the authorities and drew a distinction between:

> (a)    a case where the contract confers on one of the parties a discretion which involves "*making an assessment or choosing from a range of options, taking into account the interests of both parties*," in which case there is an implied term, which it will be extremely difficult to exclude, to the effect that that party will not exercise its discretion in an arbitrary, capricious or irrational manner; and

> (b)    a case where the only contractual discretion involves "*a simple decision whether or not to exercise an absolute contractual right*," where there is no such implied term.[76]

As Jackson LJ said, the implied term, referred to in (a) above, has been expressed in various ways and some cases have referred to an implied term to exercise the discretion "*honestly and in good faith*."[77] Lewison LJ said that such an implied term is a necessary control mechanism to prevent the exercise of the discretionary power from being at the decision maker's "*uninhibited whim*."[78] I believe that Mr Moss and I are agreed that these statements accurately state the laws of the BVI and England on this issue.[79]

69.    Where we disagree is on the application of those principles to Article 11. Rather than seeking to apply those principles, Mr Moss appears simply to rely on his interpretation of

---

[75] [2013] EWCA Civ 200, English Court of Appeal (cited by Mr Moss in footnote 27 to ¶ 83 of the Second Moss Declaration).

[76] At §§ 83, 91, 132, 136, 149.

[77] At § 78.

[78] At § 136.

[79] Second Moss Declaration at ¶ 83.

Article 11(1) (Second Moss Declaration at ¶ 84). If, however, those principles are applied to

Article 11, the following points require the implication of a duty of good faith:

(a) Under Article 11(1) the determination of NAV by the directors of the Fund or an agent appointed by them affects subscribers and redeemers, as well as the Fund. Their interests must be considered and cannot be ignored.

(b) The last sentence of Article 11(1) speaks of the directors or their agent giving the certificate of the NAV they have determined in good faith, which is consistent with the directors being under a duty to act in good faith.

(c) The determination of NAV is not a mechanical calculation; it involves the exercise of discretion and judgment. Article 11(3) states how the value of the Fund's net assets is to be calculated to make the determination under Article 11(1). This process involves the exercise of discretion and judgment as described in each of Articles 11(3)(a)-(f). Mr Moss describes the process as "*highly complex assessments of asset value and judgments.*" (Second Moss Declaration at ¶ 254). Accordingly, the exercise of the discretion to determine the NAV cannot be described as a simple decision whether or not to exercise an absolute contractual right.

70. It follows, in my opinion, that a term will be implied into the Articles to the effect at least that the directors or the agent appointed by them would exercise their power to determine NAV rationally and in good faith.

(b)    *Attribution*

71.    At ¶¶ 85-90 of the Second Moss Declaration, Mr Moss deals with the question of attribution. As he says, the leading case on the topic is the decision of the UK Supreme Court in *Bilta (UK) Ltd v Nazir*,[80] which clarified the law. I would respectfully suggest that in its application to the Funds' Common Law Claims, the law of attribution is not as complicated as Mr Moss makes out.

72.    All the Supreme Court justices agreed that whether the state of mind or knowledge of A should be attributed to another person, B, depends on the context in which the question of attribution arises; in one context it may be appropriate to make the attribution and in another it may not.[81]

73.    The context turns on which legal rule is to be applied. In the *Bilta* case, the legal rule was the duty of directors.[82] This was because the case concerned a claim by a company in liquidation, Bilta, alleging an unlawful means conspiracy to injure it, which involved two of the defendants, Mr Chopra and Mr Nazir, breaching their fiduciary duties as directors of Bilta and two other defendants, Jetivia and Mr Brunschweiler, dishonestly assisting them in so doing. Jetivia and Mr Brunschweiler were the appellants.[83]

74.    Having identified the applicable legal rule, the court should then decide whether the acts, knowledge and states of mind of the officer or agent are to be identified with the principal or company or whether they are to be separated. In the context of a claim by a

---

[80] [2016] AC 1.

[81] At § 41, per Lord Mance; §§ 181, 204-208, per Lords Toulson and Hodge. Also, Lord Sumption at §§ 82, 86-92. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[82] At §§ 42, 43 per Lord Mance; at §§ 87-89, 91, 92 per Lord Sumption. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[83] At § 3, per Lord Neuberger, with whom Lords Clarke and Carnwath agreed; §§ 32, 33, per Lord Mance; §§ 56-59, per Lord Sumption.

company founded on its directors' breach of duty, separation is required.[84] At ¶ 86 of the Second Moss Declaration, Mr Moss appears to agree with this.

75.     At ¶¶ 87, 88 of the Second Moss Declaration, Mr Moss discusses paragraphs in the judgments in *Bilta* which are directed to the issue at the heart of the appeal in that case; namely, whether the state of mind of the defaulting director or agent should be attributed to the company when it brings a claim against the directors and/or others arising out of the directors' breach of duty.[85] In my respectful opinion, this discussion does not assist the Court, because it addresses an issue which is not raised in the Amended Complaints.

76.     The present case is entirely different. The applicable legal rules are (i) the interpretation of contracts (Articles 11), (ii) agency (whether a principal (the Fund) is bound by a document issued by its agent (Citco) to a third party (a redeemer)), and (iii) breach of contract (whether the Fund, acting by its agent, is in breach of the contractual duty to act in good faith). The legal rules about fiduciary and other duties of directors to their company or agents to their principal are not engaged. As I read the Amended Complaints, they do not allege breach of duty against Citco, which is not a party, or claim remedies for Citco's alleged breach of duty against the Defendant Institutions. Instead, the Funds' Common Law Claims are primarily for restitution of payments made by mistake on the footing that the Funds are not bound by the certificates issued under Article 11(1).

77.     As the authorities set out in the First Mortimore Declaration (¶ 90) show, in the context of the Funds' Common Law Claims, the general rule is that knowledge gained by an agent in the course of his employment for his principal will ordinarily be attributed to the

---

[84] At §§ 42-43, per Lord Mance; §§ 71, 82, 86-97, per Lord Sumption. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[85] At §§ 71-78 Lord Sumption discussed the fraud exception, where there had been a breach of duty to the company, as it was before the controversial decision in *Stone & Rolls*. He returned to discuss the question of whether the illegality defence applies to claims by the company against a defaulting agent at §§ 82-97. Lord Toulson and Hodge discussed attribution, regarding the so-called fraud exception, at §§ 180-209. Lords Neuberger, Clarke and Carnwath agreed with all these paragraphs; see § 7. I do not agree with Mr Moss that these paragraphs, or any of them, are *obiter dicta*. They are all critical to the reasoning in *Bilta*.

principal. Those authorities show that, as against a third party, the state of mind or bad faith of an agent is attributed to the principal, so as to bind the latter. In footnote 95, I noted that passages in judgments of Lord Sumption and of Lords Toulson and Hodge in the *Bilta* case support the propositions stated in the First Mortimore Declaration at ¶ 90.

78.     As I said in the First Mortimore Declaration (¶ 91), the knowledge and state of mind of Citco, which is alleged to have been reckless, is attributed to the Funds, since Citco acted as their agent for the purpose of operating subscriptions and redemptions under Articles 9-11, including giving certificates and processing Redemption Payments. At ¶¶ 89 and 90, Mr Moss disagrees. I would respectfully suggest that Mr Moss is wrong to do so and that his error derives from his mischaracterisation of the claims made in the Amended Complaints as claims to recover "*money wrongly paid away as a result of the actions of a dishonest agent*." As I have said, the Common Law Claims are made in restitution and are founded on a mistake. In fact, Mr Moss's characterization of the claims is wrong for the further reason that the allegedly dishonest agent, Citco, did not induce the Funds to make the payments. Citco made the payments, so it is Citco's knowledge that is relevant. If Citco was acting in bad faith, it did not make the Redemption Payments by mistake.

79.     In ¶ 89(a) of the Second Moss Declaration, Mr Moss draws an analogy with knowing receipt claims. This is a false analogy, because in a knowing receipt claim, the defendant is liable because he is an accessory to the breach of trust or breach of fiduciary duty, whereas here the issue is whether the Funds can rely on the alleged bad faith of their agent Citco, to which the Defendant Institutions were not privy, in order to avoid the conclusive effect of the certificates.

80.     *Lipkin Gorman v Karpnale Ltd*,[86] to which Mr Moss refers (¶ 89(b) and again at ¶ 125 of the Second Moss Declaration) is a case where a partner of a firm of solicitors stole

---

[86] [1991] 2 AC 548, English House of Lords.

money from the firm's client account, which he used to buy gambling chips at the defendant's casino. The firm brought a claim against the casino for money had and received on the grounds that the firm was the legal owner of the money and the casino was a volunteer, since under English law gambling chips did not amount to good consideration. The claim succeeded, except to the extent that the casino had a change of position defence. The case did not concern mistaken payments, the actual or apparent authority of an agent, breach of duty by an agent, equitable tracing or indeed attribution. Important though this case has been in the development of English law, I would respectfully suggest that it does not assist in the present case, which is concerned with payments allegedly made by mistake.

81.    The plea for justice in ¶ 89(c) of the Second Moss Declaration ignores the importance of certainty and finality, which was recognised in the Privy Council Judgment, and the rule of agency law that a principal is bound by the acts of his agent, acting within the scope of his apparent authority, even if the agent was acting fraudulently and in furtherance of his own interests.[87] If Citco was in bad faith, the Funds who employed Citco must bear the consequences.

    *(c)    Interpretation of Article 11(1) to prevent the Funds from benefitting from their own wrong*

82.    I agree with Mr Moss (¶ 92 of the Second Moss Declaration) that the normal rules for the interpretation of contracts apply to the question of whether Article 11(1) can be interpreted in a way that prevents the Funds from benefitting from their breach of the duty of good faith. There is no difficulty about this, because that purpose can readily be achieved by adopting the Purported Compliance Interpretation discussed above. In the *Weavering Case*,

---

[87] See First Mortimore Declaration at ¶ 76, and *Bowstead and Reynolds on Agency* (20th ed, 2016) at § 8-062, quoted in footnote 81 to ¶ 76 of the First Mortimore Declaration.

Mr Martin QC had this point in mind when he said that "*it is in any event not on the face of it permissible for the company to rely on its own misconduct to terminate a contract.*"[88]

83.    The benefit that the Funds are prevented from obtaining is making recoveries from the Defendant Institutions, which had received the Redemption Payments to which they were entitled under the Articles. Mr Moss argues (¶ 91 of the Second Moss Declaration) that the Funds would not get a benefit, since they are seeking to undo the advantage that those who redeemed obtained to the detriment of those who did not. This complaint about unequal treatment is not relevant to the Common Law Claims, the merits of which are not affected by the solvency or otherwise of the plaintiff. If the complaint about unequal treatment is to be addressed at all, it should be addressed in the context of the BVI Insolvency Act Claims, which are discussed below. It was in the context of an unfair preference claim that, in the passage from the judgment in the *Weavering* Case that Mr Moss quotes (¶ 66 of the Second Moss Declaration), Mr Martin QC considered and rejected an argument on behalf of SEB for limiting the relief to be awarded to the joint official liquidators on their successful unfair preference claim.

**(4)    *Ex turpi causa non oritur actio***

84.    It is only necessary to consider this issue (addressed in the First Mortimore Declaration at ¶¶ 93-98 and the Second Moss Declaration at ¶¶ 93-101) if the Defendant Institutions do not succeed on any of the issues addressed in Section 3(1)-(3) above, but have succeeded in showing that Citco's bad faith is attributed to the Funds.

85.    At ¶ 95 of the Second Moss Declaration, Mr Moss maintains that the *ex turpi causa* principle does not apply, because the Funds' Common Law Claims are not founded on an illegal act, but on mistaken overpayment. Mr Moss's point would have been valid if made in respect of the complaints as originally issued, but they have been amended, by taking the

---

[88] At § 29.

new point about Citco's alleged bad faith, to try to circumvent the binding precedent of, and issue estoppel created by, the Privy Council Judgment (as well as the *Henderson v Henderson* principle).[89] The Funds can only maintain the Common Law Claims in the Amended Complaints by asserting that the certificates issued by Citco are invalid on the ground of the very bad faith which is attributed to the Funds. Accordingly, I would respectfully suggest that Mr Moss is wrong on this point.

86.      Mr Moss and I are agreed that the leading English authority on the *ex turpi causa* principle is the decision of the Supreme Court in *Patel v Mirza*.[90] Mr Moss and I have different views as to how that decision would be applied to the Funds' claims in the Amended Complaint (First Mortimore Declaration at ¶ 97 and Second Moss Declaration at ¶¶ 99-100) and there is nothing more that I need to say.

87.      At ¶ 101 of the Second Moss Declaration, Mr Moss compares the U.S. *in pari delicto* defence with the English *ex turpi causa* principle. I am not qualified to comment on U.S. law, but I confirm that in *Patel v Mirza* the majority adopted a flexible, "*range of factors*" approach when deciding whether a claim should be dismissed on *ex turpi causa* grounds.

### (5)      Attribution of Citco's bad faith to the Funds precludes them from claiming that Redemption Payments were made under a mistake of fact

88.      This issue is addressed in the First Mortimore Declaration (at ¶¶ 99-100) and in the Second Moss Declaration (at ¶ 102). In my opinion, if Citco's alleged wilful blindness is attributed to the Funds, on the authorities that I cited, the Redemption Payments are irrecoverable by the Funds in a claim in restitution. If Citco paid the Redemption Payments, the position is the same and there can be no recovery.

89.      Mr Moss's answer appears to be that Citco's state of mind is not attributed to the Funds so as to prevent them from recovering money paid away as a result of their agent's

---

[89] CA Amended Complaint at ¶ 49.

[90] [2016] UKSC 42.

dishonesty. I do not accept Mr Moss's answer, because, for the reasons given in paragraph 78

above, he mischaracterises the nature of the Funds' claims in the Amended Complaints.

### (6)    The New Claims

90.     These issues are addressed in the First Mortimore Declaration (¶¶ 101-107) and

the Second Moss Declaration under the heading "**The Contractual Claims**" (¶¶ 113-115).

91.     At ¶ 113 of the Second Moss Declaration, Mr Moss says that there is no need

for the Funds to rely on Citco's alleged bad faith in order to maintain any of their claims,

including the contractual claims. It is not clear to me how Mr Moss can maintain that answer.

The present position is that, under the Privy Council Judgment, the Funds are bound by the

conclusiveness of the certificates unless they are able to rely on Citco's alleged bad faith to

avoid that conclusiveness. For the reasons given in Sections 2(2)-(3) and 3(1)-(4) above, they

are unable to do so.

92.     Mr Moss disagrees with the four reasons I gave why a contractual obligation to

repay any over-payments of Redemption Payments would not be implied.

93.     In ¶ 114(a) of the Second Moss Declaration, Mr Moss responds to my point

about sections 56-59, 62 and 63 BCA 2004 by saying that section 58 is limited to dividends

and that none of the other Sections seem to relate to the recovery of redemption payments. This

is wrong. Section 56 defines "*distribution*" for the purposes of Division 4 of Part III of the

BCA 2004, which includes all those sections, as including a distribution made by a company

to a member, including by way of redemption or dividend. Section 59 gives a company the

power to redeem shares in the circumstances there mentioned, provided the solvency test in

section 57 is satisfied. If in respect of any distribution, including a redemption, the solvency

test is not satisfied, subsection 58(1) gives the company a right of recovery from the member

unless:

> "*(a)     the member received the distribution in good faith and without
> knowledge of the company's failure to satisfy the solvency test;*

> (b)    *the member has altered his position in reliance on the validity of the distribution; and*
>
> (c)    *it would be unfair to require repayment in full or at all.*"

Sections 62 and 63 deal with the case of companies like the Funds,[91] whose Articles give members a right of redemption. In such cases, the redemption is deemed not to be a distribution, so that the solvency test in section 57 and the remedy in section 58 do not apply. Sections 56-59 are relevant to the implied term that Mr Moss advocates, because, as I have said, his term appears to put redeeming shareholders in a more onerous position than they would have been in if section 58 had been applicable, in that the alleged implied term denies the redeeming shareholders the defences that are available under that section. That is one reason why a BVI Court would not imply such a term.

94.    In ¶ 114(b) of the Second Moss Declaration, Mr Moss correctly says that in certain contexts the court will imply a term into a contract which parallels a duty owed under the law of tort (*e.g.* a duty of care),[92] but he cites no case where a term has been implied that gives a party more extensive rights than he would have under the general law. If a term is to be implied, it must satisfy the requirements of necessity either for business efficacy or to prevent the contract from lacking commercial or practical coherence. Neither requirement is satisfied by the Funds' proposed implied term, which attempts to give them more extensive rights than they would have under the common law of restitution. The Articles (which take a familiar form) work perfectly well without the alleged implied term. Contracts seldom, if ever, legislate in

---

[91] These sections do not apply to the Funds, which were incorporated under the BVI International Business Companies Act (Cap 291). Paragraph 9 of the transitional provisions in Schedule 2 to the BCA 2004 provides that paragraphs 10-23 apply in place of sections 56-65. Paragraph 19 deals, among other things, with redemptions by preserving the old regime under section 33 of the International Business Companies Act, under which the provision for directors to determine solvency before a redemption did not apply where the member had a right to have his shares redeemed and there is no statutory cause of action equivalent to section 58 BCA 2004.

[92] The example he gives of an implied term that professional services will be supplied with reasonable skill and care is in fact implied by section 13 of the Supply of Goods and Services Act 1982. *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, English House of Lords, on which Mr Moss also relies, is a case where the House of Lords affirmed the existence of a duty in tort that was not materially different from the acknowledged contractual duty: see pages 194F-G, 195A, per Lord Goff.

advance for mistaken payments. The modern law of restitution has developed to cater for such situations, without the need to resort to the fiction of implying a term.

95.     As to ¶ 114(c) of the Second Moss Declaration, § 18 of Lord Sumption's judgment in the Privy Council Judgment was concerned only with restitution. There is nothing to suggest that his summary of restitution principles extended to implied terms. In *Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners*,[93] Lord Sumption had said that English law does not recognise:

> "*an action for the recovery of payments on the simple ground that they were not due…. It is necessary, as the law presently stands, to bring the facts within one of the categories of case in which the law recognises that the recipient's retention of the money would be unjust.*"

That is presumably why the Funds had previously tried, unsuccessfully, to bring their restitution claims on the ground of mistake.

96.     Mr Moss also refers to *Aspect Contracts (Asbestos) Ltd v Higgins Construction plc*,[94] in which Lord Mance said that the overpayment claimed by the claimant was repayable, either by contractual implication or under a restitutionary obligation. The facts of that case are far removed from the circumstances of the Funds' Common Law Claims in these proceedings and give no support for the term that the Funds seek to imply. In *Aspect Contracts*, the parties had referred a dispute under a building contract for determination under a statutory adjudication scheme. This scheme provided a speedy provisional means of adjudicating disputes under which the award was binding unless and until the dispute was finally determined. It was a necessary legal consequence of the scheme, implied by the legislation into the parties' contract, that if one party had paid the other party the amount of the provisional award, the payer had a right to recover any overpayment identified when the dispute was finally determined. That right was either under an implied term or in restitution. In contrast, the procedure for redemption

---

[93] [2012] 2 AC 337 at § 162.

[94] [2015] 1 WLR 2961, UK Supreme Court. The other Supreme Court Justices agreed with Lord Mance.

under the Articles was designed to be final and conclusive, for the reasons explained by Lord Sumption in the Privy Council Judgment.

97.     As to ¶ 114(d) of the Second Moss Declaration, the fact that a proposed implied term works in a one-sided way may demonstrate that it is neither obvious nor necessary.

## 4.    CITCO'S ALLEGED LACK OF GOOD FAITH

98.     In the First Mortimore Declaration (¶¶ 108-116), I addressed the Funds' case made in the Amended Complaints dated September 2016.[95] Mr Moss answered these paragraphs in the Second Moss Declaration (¶¶ 103-112). In these paragraphs, Mr Moss seems to be arguing that reckless indifference, to which he refers in ¶ 104(c), is a lower bar for establishing bad faith or dishonesty than Nelsonian blindness. I do not agree; the two phrases amount to much the same thing. My opinion is supported by Lord Hobhouse (see paragraph 102 below). If Mr Moss is right, litigants would allege reckless indifference as a matter of course to avoid the difficulties of establishing wilful blindness, but that is not what happens.

99.     Mr Moss and I agree that the leading authority on what is required for the purposes of deceit is the speech of Lord Herschell in *Derry v Peek*,[96] which we both quote. Lord Herschell identified three ways in which a person would act fraudulently: "*(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.*" He went on to say that, although he had treated (2) and (3) as distinct cases, (3) was merely an instance of (2), in the sense that recklessness or not caring whether a statement is true or false means that the person can have no real belief in the truth of what he states. A recent illustration of this is *Mortgage Express v Countrywide Surveyors Ltd*,[97] where a valuer issued a production line

---

[95] Identified in the First Mortimore Declaration at ¶ 5(a)-(c).

[96] (1889) 14 App Cas 337, 374, English House of Lords.

[97] [2016] EWHC 224 (Ch), English High Court. For a review of the case law on this topic, see the leading textbook *Clerk & Lindsell on Torts* (21st ed) at §§ 18-19, 18-21.

property valuation without visiting the property and could have had no belief in the truth of the valuation.

100.    In ¶ 106 of the Second Moss Declaration, Mr Moss quotes from the speech of Lord Herschell in *London Joint Stock Bank v Simmons*,[98] in which Lord Herschell refers to the existence of an unchecked suspicion being inconsistent with good faith. That passage must be read subject to the much more recent authoritative statement of Lord Scott in *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* (quoted in the First Mortimore Declaration at ¶ 112),[99] which clarifies what sort of suspicion a person must have before he can be said to act with such recklessness or lack of care for the truth or falsity of what he says that he can have no belief in its truth. Lord Scott explained that the suspicion must be "*firmly grounded and targeted on specific facts*."

101.    In ¶ 107 of the Second Moss Declaration, Mr Moss quotes from Lord Nicholls's speech in *Royal Brunei Airlines v Tan*,[100] where he discusses the boundary between acting honestly and dishonestly in trust, commercial and property transactions. The illustrations Lord Nicholls gives can all be described as targeted at specific facts or matters: misapplication of trust assets and prejudice to other people's rights or possible rights.

102.    Finally, Mr Moss quotes passages from the speeches of Lords Steyn and Hobhouse in *Three Rivers District Council v Bank of England (No 3)*,[101] where the liquidators of Bank of Credit and Commerce International SA ("**BCCI**") brought a claim against the Bank of England, alleging the tort of misfeasance in public office, *i.e.* that the Bank was guilty of dishonest and unlawful conduct, in failing to carry out its statutory regulatory functions in relation to BCCI. In my opinion, this case should not be read as lowering the bar for making a

---

[98] [1892] AC 201, 223, English House of Lords.

[99] [2003] 1 AC 469, English House of Lords.

[100] [1995] 2 AC 378, 389-390, Privy Council on appeal from Singapore.

[101] [2003] 2 AC 1, 1919, 192, 230, English House of Lords.

case of bad faith or dishonesty in a commercial context. Lord Hobhouse's statement is consistent with the authorities cited in the preceding paragraphs:

> "*Another way of putting it is that he must be shown either to have known that he was acting unlawfully or to have wilfully disregarded the risk that his act was unlawful.*"

Lord Steyn concluded that what was required was "*a state of mind of reckless indifference to the illegality of his act.*" Here the recklessness was as to the legality, or otherwise, of what was done or not done as regulator under the applicable statutory scheme. A bank official would be expected to keep in mind the Bank's regulatory function, so that the statutory scheme identifies the targeted facts that he should check and verify. This is far removed from the context of a case such as that described in the Amended Complaints, where the issue is what, as a factual matter, people knew or closed their eyes to knowing, and not whether they knew or should have known that what they were doing (or not doing) was unlawful. Even so, it is interesting to note that in the second series of House of Lords speeches, considering the adequacy of the plaintiffs' pleading, Lord Hobhouse expressly referred to Lord Scott's speech in *Manifest Shipping* and equated "blind-eye" knowledge, as discussed by Lord Scott, with the statements about dishonesty and bad faith made by himself and Lords Steyn and Hutton in the first series of judgments (quoted in the Second Moss Declaration at ¶ 108).[102]

103.    Thus, whenever a claim alleges wilful blindness or recklessness, amounting to dishonesty, it is always necessary to meet the standard stated by Lord Scott. A mere sense of unease is not enough. As I have said, in the context of the present cases, there is no material difference between what is required to show recklessness or wilful blindness.

104.    In ¶ 112 Mr Moss takes me to task for using the phrase "*gross negligence.*" I am familiar with the cases cited by Mr Moss. I used the phrase to reflect the language of Lord Scott who said "*negligence, albeit gross,*" to emphasise that a person may be guilty of a high

---

[102] At §164 on p 285.

degree of negligence without it being appropriate to label him dishonest or to treat him as having blind-eye knowledge (First Mortimore Declaration at ¶¶ 112-114).

## 5. THE KNOWLEDGE DEFENDANT INSTITUTIONS

105.    In the First Mortimore Declaration (¶¶ 117-134), I addressed the Funds' case made in the Amended Complaints dated September 2016.[103] Mr Moss answered these paragraphs in the Second Moss Declaration (¶¶ 116-120).

106.    The Proposed Fourth Amended ABN Amro Complaint, served on 30 March 2017, alleges for the first time that the Citco Record Subscriber, the Citco Banks and the Citco Subscriber had the roles summarised in paragraph 7 above and that (i) the Citco Record Subscriber and the Citco Banks were aware of "*the irregularities in BLMIS at all relevant times,*"[104] and (ii) the applicable Defendant Institutions had the same knowledge as the Citco Record Subscriber and the Citco Banks "*regarding all relevant matters relating to BLMIS and the Funds' [NAV] at all relevant times.*"[105]

107.    In relation to the allegations of knowledge against the Defendant Institutions, there are two situations to consider: (i) where the Defendant Institution was the registered member of a Fund and itself subscribed for and redeemed shares in the Fund, as described in the Amended Complaints, and (ii) where the Citco Record Subscriber was the registered member of the Fund as trustee for the Defendant Institution and the Citco Banks and/or Citco Subscriber acted as agent for the Defendant Institution.[106] Mr Moss addresses the latter situation in the Second Moss Declaration (¶¶ 121-123).

---

[103] Identified in the First Mortimore Declaration at ¶ 5(a)-(c).

[104] The Proposed Fourth Amended ABN Amro Amended Complaint at ¶ 176.

[105] The Proposed Fourth Amended ABN Amro Amended Complaint at ¶ 177.

[106] But note the confusion in the Proposed Fourth Amended ABN Amro Complaint, mentioned in footnote 5 above.

### (1)    The Defendant Institution as member and redeemer

108.    At ¶ 117 of the Second Moss Declaration, Mr Moss responds to points I made in ¶¶ 120-123 about the implied term advocated by Mr Moss, which I set out in the First Mortimore Declaration at ¶ 118(a). Mr Moss has clarified that he was not intending to support the implied term pleaded in the HSBC Amended Complaint, but a different implied term that would only arise if a Knowledge Defendant Institution pleads a defence. My opinion remains that the implied term suggested by Mr Moss fails to meet the standard for implying a term into a contract; *i.e.* necessity for business efficacy or to provide commercial or practical coherence to the contract. Further, the suggested implied term is contrary to the need for certainty and finality and the express terms of Article 11(1).

109.    At ¶¶ 118 and 119 of the Second Moss Declaration, Mr Moss responds to what I had said in ¶¶ 124-129 of the First Mortimore Declaration, dealing with his opinion that absence of good faith may negate the good consideration defence. I note that Mr Moss has not addressed the rejection of his argument in the *Kingate Case* at § 167, to which I referred. For the reasons given in those paragraphs, I remain of the opinion that the good or bad faith of the recipient is irrelevant to the availability of the good consideration defence to a claim in restitution.

110.    In ¶ 120 of the Second Moss Declaration, Mr Moss takes issue with what I said about the allegations of bad faith made against the Knowledge Defendant Institutions (First Mortimore Declaration at ¶¶ 132-134), but I note that he does not comment on my opinion (which I maintain) that the Knowledge Defendant Institutions were entitled to rely on what they were told by Citco when it published the certificates unless they themselves were dishonest or irrational (First Mortimore Declaration at ¶ 131).

**(2)**      **The Citco Subscriber as agent and trustee**

111.      Solely for the purpose of considering this scenario, I shall treat the Citco Record

Subscriber, Citco Bank and/or Citco Subscriber as if they were one entity, which I will call the

Citco Subscriber, unless it is necessary to refer specifically to the Citco Record Subscriber or

the Citco Bank. I shall assume that the Citco Subscriber had such knowledge as to make it in

bad faith but that the Defendant Institutions themselves did not, even though the Court

scrutinizing the relevant paragraphs of the Proposed Fourth Amended ABN Amro Complaint

should find that they do not meet the standard (described in Section 4 above) for pleading the

requisite actual or blind-eye knowledge of the BLMIS Ponzi fraud or for attributing the alleged

knowledge of Citco to the Citco Subscriber.

112.      In ¶ 121 of the Second Moss Declaration, Mr Moss expresses the opinion that

if the registered shareholder and subscriber is in bad faith, then its bad faith will prevent the

beneficial owner from raising a defence of contractual entitlement to the Liquidators' (or more

properly the Funds') contractual or restitution claim. The beneficial owners are said to be bound

by the bad faith of the registered shareholder and subscriber.

113.      In my opinion, Mr Moss's proposition is wrong for several reasons. First,

Mr Moss's argument presupposes that the bad faith of the recipient is relevant to the availability

of defences to restitution claims. As I have explained in the First Mortimore Declaration

(¶¶ 124-129) and in paragraph 109 above, that is not the case.

114.      Second, Mr Moss's reliance on Article 8 and section 42 BCA 2004 is misplaced.

Section 42 is a familiar provision which has long been part of English companies legislation.[107]

It prevents a company from entering notice of a trust in its register of members. Article 8 is a

familiar regulation adopted by many companies,[108] which states that the Funds are entitled to

---

[107] See Section 126 of the English Companies Act 2006, which replaced without change Section 360 of the
English Companies Act 1985.

[108] Compare regulation 5 of Table A to the English Companies Act 1985.

treat the registered member as absolute owner of the shares and are not obliged to recognise equitable interests in the shares. Accordingly, a Fund need only give notice of general meetings to the registered member and obtains a good discharge if it pays dividends or other distributions to the registered member. The provisions of section 42 and Article 8 do not in all circumstances allow the Fund to ignore equitable interests of which it has actual notice.[109] Nor do they prevent the Funds, directly or through Citco, as their agent, from entering into transactions with the Citco Subscriber as agent for the Defendant Institutions for the redemption of shares on the terms of the Articles. Furthermore, the provisions of section 42 and Article 8 cease to be relevant after the Dealing Day, when the redeemed member ceased to be a member, and have no relevance to any payment of a Redemption Payment made by Citco.

115.    Third, Mr Moss relies on clause 27 of the subscription agreements. The position of a member of a Fund who wishes that its shares be redeemed is regulated by Articles 10 and 11. I do not understand how clause 27 can be relevant to redemptions. This also was the opinion of Lord Sumption (see Privy Council Judgment at §§ 10, 17, 20).

116.    Fourth, the Funds' case in this respect amounts to an attempt to take advantage of the multiple agency functions of Citco and the Citco Subscriber to put the Funds in a better position in relation to the Common Law Claims than they would have been if the Defendant Institution had been the registered member. This contradicts the basic principle that a person should not be able, by interposing an agent or agents, to put himself in a better position than that in which he would have been if he had dealt personally.[110] As I have said,[111] each Fund delegated to Citco its functions in relation to the determination of NAV and redemptions, with the result that Citco's knowledge in relation to those matters is attributed to the Fund. As agent,

---

[109] *Bradford Banking Co v Henry Briggs & Co* (1886) 12 App Cas 29, English House of Lords.

[110] *Bowstead and Reynolds on Agency* (20th ed) at § 8-209;

[111] First Mortimore Declaration at ¶ 77.

Citco received the redemption notice in respect of the shares held for the Defendant Institution, accepted the surrender of the shares, and paid the Redemption Price into the account of the Defendant Institution with the Citco Bank (or to the Citco Subscriber as agent for the Defendant Institution).[112] If this is what happened, the arrangements amount to direct dealings between the Fund and the Defendant Institution with the same legal consequences as would have applied without the participation of the Citco Record Subscriber, Citco Bank or Citco Subscriber.

117.    Finally, I should add that, if the Defendant Institutions cannot rely on the Funds' Articles, as Mr Moss seems to be saying, then they cannot be bound by them and the Funds' various contractual claims against them fall away.

118.    It follows that, if the bad faith of the recipient is relevant, a Defendant Institution could only receive a Redemption Payment in bad faith if that bad faith is attributed to it from the bad faith of its agent, the Citco Subscriber. This is the issue that Mr Moss addresses at ¶¶ 122 and 123 of the Second Moss Declaration. *Bowstead* states the general rules that (i) notice given to an agent is effective as notice to the principal if the agent receives it within the scope of his actual or apparent authority,[113] and (ii) knowledge relating to the subject matter of the agency acquired by an agent acting within the scope of his authority may be imputed to his principal.[114] So, to take a simple example, where a creditor instructs a messenger to collect a cheque from a debtor and pay it into the creditor's bank account, it is not within the scope of the messenger's actual or apparent authority to receive information about the debtor's financial circumstances, and so the creditor does not have notice of any information about the debtor's financial circumstances that is given to the messenger.

---

[112] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 107, 108. But see ¶¶ 232, 241, 250, 251, which allege that the payments were made to the Citco Subscriber.

[113] *Bowstead*: Article 94 at § 8-204.

[114] *Bowstead*: Article 94(1) at § 8-207.

119.    The Funds' argument is that the Defendant Institutions had the same knowledge of irregularities within BLMIS that Citco had, so as to give them blind-eye knowledge of the BLMIS Ponzi fraud, because this knowledge was passed on to their agent, the Citco Subscriber. The Defendant Institutions would only potentially be treated as having knowledge of those matters if it was within the scope of the agency of the Citco Subscriber with respect to them to receive it. That would require the Court to consider the Citco Subscriber's functions as agents of the Defendant Institutions as pleaded in the Proposed Fourth Amended ABN Amro Complaint. Under the B&C Agreements, which are in substantially similar terms, the Citco Subscriber, as broker, acted on the instructions of the Defendant Institution in a non-advisory capacity,[115] and the Citco Record Subscriber, as custodian, acted on the instructions of the Defendant Institutions without any monitoring role.[116] If BVI law were applicable, on those facts, a Court would conclude that it was outside the scope of the essentially ministerial functions of the Citco Subscriber and the Citco Record Subscriber for them to receive information about irregularities in BLMIS, and that the Defendant Institutions are not fixed with any such knowledge that the Citco Subscriber and/or the Citco Record Subscriber may have had.

120.    In ¶ 122 of the Second Moss Declaration, Mr Moss states that "*the knowledge of an agent connected with the subject matter of his agency and acquired in the course of his employment is attributed to the principal*." This is similar to the principle I stated in paragraph 118 above at (ii), provided that "*in the course of his employment*" means within the scope of his actual or apparent authority. Mr Moss goes on to consider the question of whether information acquired by the registered shareholder before the commencement of his agency for the Defendant Institution should be imputed to the latter. The answer to this question depends

---

[115] Exhibit G to Mr Molton's Declaration at clauses 2.1-2.3, 2.10.

[116] Exhibit G to Mr Molton's Declaration at clauses 6.3, 6.4, 7.1.4, 7.1.15 and 7.1.7.

on the scope of the agency, but even where the information is within the scope of the agency, knowledge will not usually be imputed to the principal if it was acquired by the agent before or outside the agent's engagement for the principal.[117] The well-known statement of Lord Halsbury LC in *Blackburn, Low & Co v Vigors* provides a useful guide:

> "*Some agents so far represent the principal that in all respects their acts and intentions and their knowledge may truly be said to be the acts, intentions, and knowledge of the principal. Other agents may have so limited and narrow an authority both in fact and in the common understanding of their form of employment that it would be quite inaccurate to say that such an agent's knowledge or intentions are the knowledge or intentions of his principal...*"[118]

I quoted the first sentence of that passage in relation to Citco's agency on behalf of the Funds in the First Mortimore Declaration at ¶ 90. The second sentence is apposite to the agency of the Citco Subscriber on behalf of the Defendant Institutions. One instance where information acquired before or outside the agent's engagement would be imputed to the principal is where the principal engaged the agent for his knowledge,[119] which is easily illustrated by reverting to the simple example of the creditor's messenger. It would make no difference if the messenger already knew of the debtor's financial difficulties before he was engaged to collect the cheque. This is because the agency was limited to providing a collection service; the messenger was not engaged for his knowledge. Under BVI law, applying those principles to the facts stated in the Proposed Fourth Amended ABN Amro Complaint, the Court would find, as the B&C Agreements indicate, that the Defendant Institutions engaged the Citco Subscriber and the Citco Record Subscriber to exercise ministerial functions, with no advisory role, and that there are no facts alleged to the effect that they were engaged for their knowledge of BLMIS.[120]

---

[117] See the discussion in *Bowstead* at § 8-210.

[118] (1887) 12 App Cas 531, 537, 538, English House of Lords.

[119] *Bowstead* Article 95(1) at § 8-207: "*Where an agent is authorised to enter into a transaction in which his own knowledge is material, knowledge which he acquired outside the scope of his authority may also be imputed to the principal.*" See comment at § 8-211.

[120] Proposed Fourth Amended ABN Amro Complaint at ¶ 176 includes the plea: "*As set forth above, and in accordance with the B&C Agreements, at all times this knowledge [of irregularities at BLMIS] was relevant if*

121.    In ¶ 123 of the Second Moss Declaration, Mr Moss expresses the opinion that where a claimant claims against a person for knowing receipt of misapplied money, and the person acted through an agent who knows of the misapplication, it will be no defence for the principal to say that his agent acted fraudulently. As I have said in paragraph 78 above, this mischaracterizes the Proposed Fourth Amended ABN Amro Complaint, which does not assert a claim of knowing receipt which is the distinct cause of action. Mr Moss relies on a passage from the *Bilta* case, where Lords Toulson and Hodge were considering whether knowledge should be attributed to a company when a third party pursues a claim against the company arising from the misconduct of the company's director, employee or agent. In such a case, they said that the rules of agency would normally suffice to attribute to the company not only the act of the director, employee or agent, but also his state of mind.[121] The situation considered by Lords Toulson and Hodge is far removed from the Funds' claims. The Funds are in the position of Lords Toulson and Hodge's third party, but they are not pursuing claims against the Defendant Institutions arising from the misconduct of the Defendant Institutions' agents. Nor were Lords Toulson and Hodge considering a case where the scope of the agency was limited to, for example, ministerial functions.

## 6.    OTHER ISSUES

122.    In ¶¶ 124-125 of the Second Moss Declaration, under the heading "Other issues: ministerial receipt," Mr Moss addresses the question of whether the Defendant Institutions would have a defence to the Common Law Claims on the ground that they received Redemption Payments as agents for their customers to whom they were paid over.

---

*not material to Defendants' investing in the Funds to participate in the Funds' investments in BLMIS*." There are no earlier paragraphs in the Proposed Fourth Amended ABN Amro Complaint that might support that plea. Further, the plea is contradicted by the terms of the B&C Agreements (paragraph 119 above).

[121] [2016] AC 1 at §§ 204, 205.

123.    A BVI court would recognise the "ministerial receipt" defence under BVI law.

In *Portman Building Society v Hamlyn Taylor Neck*,[122] Millett LJ explained that:

> *"At common law the agent recipient is regarded as a mere conduit for the money, which is treated as paid to the principal, not to the agent. … The true rule is that where the plaintiff has paid money under (for example) a mistake to the agent of a third party, he may sue the principal whether or not the agent has accounted to him, for in contemplation of law the payment is made to the principal and not to his agent. If the agent still retains the money, however, the plaintiff may elect to sue either the principal or the agent, and the agent remains liable if he pays the money over to his principal after notice of the claim. If he wishes to protect himself, he should interplead. But once the agent has paid the money to his principal or to his order without notice of the claim, the plaintiff must sue the principal."*

Here, to the extent the Amended Complaints allege that the Defendant Institutions acted on behalf of their principals to whom they have paid the money, this defence is available and prevents the Funds from claiming the Redemption Payments from the Defendant Institutions.

124.    In ¶ 126 of the Second Moss Declaration, under the heading "Other issues: damages," Mr Moss considers an argument that has been raised to the effect that the Funds have suffered no loss, since they sold shares at inflated prices. He also states his opinion on the question of whether a person who remained a member of a Fund when it went into liquidation may rescind his agreement to acquire shares and/or claim damages for misrepresentation. These are not matters that are alleged in the Amended Complaints or the Proposed Fourth ABN Amro Complaint, and there is nothing about them in evidence that I have read. I therefore will not address them.

## B.    BVI INSOLVENCY ACT CLAIMS

## 7.    INTRODUCTION

125.    In the First Mortimore Declaration (¶¶ 135-174), I discussed the origins and provisions of sections 245 and 246 of the BVI Insolvency Act and explained the case law

---

[122] [1998] 4 All ER 202, 207f-j, English Court of Appeal.

relevant to claims brought under those sections. In Sections 8 and 9 below, I will address separately Mr Moss's responses with respect to the unfair preference claim under section 245 and the undervalue transaction claim under section 246 on the basis described in the Amended Complaints; *i.e.* that the shares in the Funds were registered in the names of the Defendant Institutions. In Section 10 below, I will address the different legal position where the shares were registered in the name of the Citco Record Subscriber or the Citco Subscriber. In Section 11 below, I will respond to Mr Moss's arguments about the court which has power to grant relief under section 249, where there has been a transaction within sections 245 or 246.

126.    First, however, I will respond to Mr Moss's arguments as to three issues that bear on claims brought under both sections 245 and 246: (i) the lack of overlap between those sections, such that a single transaction cannot fall under both sections, (ii) what is "a transaction entered into" for the purposes of both sections, and (iii) the restrictions on the use of hindsight in relation to claims under both sections.

**(1)    No overlap between sections 245 and 246**

127.    As I previously explained, a single transaction cannot be both an unfair preference and an undervalue transaction (First Mortimore Declaration at ¶¶ 151-154). That is supported by Professor Goode in his book *Principles of Corporate Insolvency Law* and the decision of Millett J in *Re MC Bacon Ltd* (First Mortimore Declaration at ¶¶ 152, 153). By way of example, Professor Goode refers to a case where a company paid a connected company an excessive amount for services. In such a case he said that, to the extent of the value of the services, the payment was a preference and to the extent of the excess, the payment was an undervalue transaction.[123] Mr Moss has not cited any case where a single transaction has been

---

[123] Goode, *Principles of Corporate Insolvency Law* (4th ed) at § 13-107. The example is taken from *Re HHO Licensing Ltd* [2008] 1 BCLC 223, referred to in footnote 146 to ¶ 160 of the First Mortimore Declaration and in paragraph 134 below as *Clements v Henry Hadaway Organisation Ltd*. In that case, there were distinct transactions; under one the company arranged to pay its receivables into the connected company's bank account and under another the company purported to agree to pay the connected company an excessive amount for services; see the judgment at § 20. That is the nearest I have come to finding a case where a transaction has been

held to be both an unfair preference and an undervalue transaction, and I am not aware of any such case.

128.    Finding no authority to support his argument that a single transaction can fall under both sections, Mr Moss nevertheless criticises the views of Professor Goode and Millett J as being, according to him, overly dogmatic, and suggests that in English courts "*dogmatic concepts*" are "*usually*" overturned (Second Moss Declaration at ¶ 134). I disagree with this treatment of Professor Goode and Millett J, which does not fairly reflect their contributions to the understanding and development of English insolvency law. As a judge of the Chancery Division (1986-1994), as a Lord Justice in the Court of Appeal (1994-1998), as Lord Millett in the House of Lords (1998-2004) and as a non-permanent judge of the Hong Kong Court of Final Appeal since 2000, Lord Millett has given many significant and influential judgments in the fields of insolvency and company law.[124] Similarly, Professor Goode has been one of the most influential and distinguished academic commentators on English insolvency law.[125]

129.    Moreover, contrary to Mr Moss's dismissive treatment of it, *Re MC Bacon Ltd*[126] was an early landmark case on the interpretation and application of the then-new preference and undervalue provisions in the English Insolvency Act. Millett J's explanation of the new law about preferences has been followed consistently. His decision that the grant of a charge to secure a debt cannot be a transaction at undervalue has been followed on two

---

found to involve both an unfair preference and an undervalue transaction. In *Re Sonatacus Ltd* [2007] 2 BCLC 627, mentioned in footnote 196 to paragraph 210 below, both sections had been relied upon, but the claim was decided on the basis of unfair preference, not undervalue transaction.

[124] As Peter Millett QC, he was a member of the committee, under the chairmanship of Sir Kenneth Cork, which in June 1982 produced a report on *Insolvency Law and Practice* (Cmnd. 8558) that was "*the main inspiration for the reforms*" introduced in 1985 and now embodied in the English Insolvency Act; see *Joint Administrators of LB Holdings Intermediate 2 Ltd v Joint Administrators of Lehman Brothers Ltd* [2017] UKSC 38 at § 10, UK Supreme Court.

[125] Sir Roy Goode was appointed a QC in 1990 and knighted for services to academic law in 2000. Among his many academic posts and distinctions, he is Emeritus Professor of Law at the University of Oxford. His publications include *Commercial Law* (5th ed, 2016), *Legal Problems of Credit and Security* (5th ed, 2013), *Principles of Corporate Insolvency Law* (4th ed, 2011) and *Proprietary Rights and Insolvency in Sales Transactions* (3rd ed, 2010).

[126] [1990] BCLC 324.

occasions by the English Court of Appeal[127] and is supported by Professor Goode (paragraph

130 below). It is correct that in *Hill v Spread Trustee Co Ltd*,[128] where the debtor had granted

security as part of a series of transactions to transfer property to defeat his creditors, Arden LJ

questioned the proper reach of Millett J's decision, because (i) she said that it did not follow

that the grant of security can never amount to a transaction for no consideration, and (ii) she

doubted whether Millett J's decision could apply to charges by way of legal mortgage.[129]

130.    Arden LJ's judgment in *Hill* is of little help to the Court because, as Professor

Goode noted in his book *Principles of Corporate Insolvency Law*, her judgment:

> "*confuses a transaction at an undervalue with a preference and cannot
> be accepted. The question is whether there is a transaction at an
> undervalue, meaning that the company parts with more than it receives.
> If the company grants a security interest, it still has the right to redeem
> and any payment it makes pro tanto reduces its indebtedness, so that it
> loses nothing.*"[130]

I agree with this.

**(2)    The transaction entered into**

131.    Mr Moss and I are agreed as to the meaning to be given to the word

"*transaction*" in sections 245 and 246 (First Mortimore Declaration at ¶¶ 159-161 and Second

Moss Declaration at ¶ 146).

132.    Moreover, in relation to the phrase "*a transaction entered into by a company*"

in subsection 245(1) and the comparable phrases used in sections 244(2) and 246, Mr Moss

---

[127] *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, 319, 320; *Feakins v DEFRA* [2007] BCC 54 at § 72 where Jonathan Parker LJ followed the reasoning of Millett J and said that the charge did not deplete the company's assets.

[128] [2007] 1 BCLC 450, English Court of Appeal, at §§ 93 and 138, with which Nourse and Waller LJJ agreed.

[129] This was said in light of the speeches of Lord Hoffmann and Lord Millett in *Buchler v Talbot* [2004] 2 AC 298 at §§ 29, 51. I do not consider that those speeches cast any doubt on Millett J's decision. If a legal charge is given to secure a debt, there is no diminution of the company's assets, any more than there would be if the charge was equitable.

[130] At § 13-38, footnote 116. Professor Goode is not right when he says that the *Feakins* case was decided after the *Hill* case. In fact, it was decided on 9 December 2005, a few weeks before the argument in *Hill*, on which judgment was given on 12 May 2006. *Feakins* was not cited in *Hill*.

does not appear to disagree with my opinion that these phrases must have the same meaning in each of sections 245 and 246 (First Mortimore Declaration at ¶ 157).

133.    Mr Moss does not agree, however, that (i) the phrases require the court to focus on the inception of the transaction, and that (ii) it is necessary to distinguish between mere performance of an existing transaction and entry into a distinct, albeit linked transaction (First Mortimore Declaration at ¶¶162-166 and Second Moss Declaration at ¶¶ 147-151).

134.    Mr Moss argues incorrectly that the proposition that the Court should focus on the inception of the transaction is contradicted by the three cases I cited in the First Mortimore Declaration at ¶ 160 footnote 146. These cases all confirm that a transaction in this context connotes some form of dealing. In *Re Taylor Sinclair (Capital) Ltd*,[131] the Deputy Judge said that a transaction within section 238 of the English Insolvency Act "*will be something which involves at least some element of dealing between the parties to the transaction*"[132] and found that the mere payment of cheques by the company to the other party did not amount to a transaction within the section. *Clements v Henry Hadaway Organisation Ltd*[133] followed the approach in *Re Taylor Sinclair*. Beyond that, neither case discusses the identification of the transaction said to have been at an undervalue or its inception.

135.    The third case, *Feakins v DEFRA*,[134] concerned a transaction defrauding creditors. The debtor (F) owned farm land which was subject to (i) an agricultural tenancy in favour of a company he controlled, (ii) a first mortgage to secure his liabilities to a bank, and (iii) a second ranking charging order to secure a judgment debt owed to DEFRA. In order to defeat the interests of DEFRA, F entered in an arrangement, agreement or understanding with

---

[131] [2001] 2 BCLC 176, English High Court, at §§ 19-22.

[132] [2001] 2 BCLC 176, English High Court, at § 20.

[133] [2008] 1 BCLC 223, English High Court, at § 31 (see the quotation in the First Mortimore Declaration at ¶ 160 footnote 146).

[134] [2007] BCC 54, English Court of Appeal.

his fiancée, H, for three steps to be taken: (i) they would persuade the bank, as mortgagee, to sell the farm land to H subject to the agricultural tenancy, (ii) F would procure his company to release the agricultural tenancy, and (iii) H would sell the farm land to a third party free of encumbrances and the agricultural tenancy. The Court of Appeal agreed with the judge that the transaction that defrauded DEFRA was the initial arrangement, agreement or understanding between F and H, not the later sale by the bank.[135] This case supports my opinion that the statutory wording requires the Court to look at the inception of the transaction, not the steps taken to implement it, and is consistent with *Re MC Bacon Ltd* (First Mortimore Declaration at ¶ 162).

136.    In response to my point that entry into the transaction must be distinguished from performance of it, Mr Moss argues that section 245 of the BVI Act is "*very firmly based on*" and "*largely copied over from*" section 239 of the English Insolvency Act, under which it is clear (as I agree) that a payment is capable of giving a preference.[136] Mr Moss's argument is not correct. Except for subsection 245(1)(c) of the BVI Act, where the BVI legislature adopted almost exactly the language of subsection 239(4)(b) of the English Insolvency Act, the language used in the remainder of section 245 is different from that used in section 239 of the English Insolvency Act. The differences of language are the consequence of different statutory purposes. Whereas under the English section 239, a preference is unfair if, among other things, it is given with the requisite desire to prefer, under the BVI Act a preference is unfair if, among other things, the transaction was entered into outside the ordinary course of business. This is a change of substance which meant that much of the language used in the English section 239 was not appropriate for the BVI section 245. In consequence of the difference in language, there may have been an unfair preference under one section, but not under the other. In short,

---

[135] At §§ 74-78.

[136] Second Moss Declaration (¶¶ 147-48).

Mr Moss's arguments based on the different language of section 239 of the English Insolvency Act are not relevant to the analysis of section 245 of the BVI Insolvency Act.

137.    If the BVI Court finds that a transaction entered into by a company with one of its creditors is an unfair preference within section 245, it may make an order for the recovery of any payment made in performance of the transaction (subsections 249(1)(b) and (2)(d)). Therefore, it would not be necessary or appropriate to consider whether a mere payment made pursuant to the transaction should be regarded as a distinct transaction, albeit linked to the transaction under which the payment was made. In fact, if the transaction is valid as being in the ordinary course of business, it makes no sense to invalidate its performance. A demand for payment from the creditor, if the debt is not paid on time, or the company subsequently becoming unable to pay its debts, may justify the court in regarding the decision to make the payment as a distinct but linked transaction to which section 245 may be applied (see the cases in footnote 152 to ¶ 164 in the First Mortimore Declaration).

138.    The practical significance of the distinction between the transaction entered into and the performance of the transaction lies in the disagreement between myself and Mr Moss as to whether the transaction to which sections 245 and/or 246 may apply is the Redemption or, as Mr Moss argues, the Redemption Payment. I addressed this question in the First Mortimore Declaration (¶¶ 168-172) and Mr Moss has responded in the Second Moss Declaration (¶¶ 152-157).

139.    Mr Moss and I agree that a Redemption, entered into when the Fund receives a redemption notice, is a transaction to which sections 245 and 246 may apply. In ¶ 169 of the First Mortimore Declaration, I said that service of the redemption notice implemented a procedure laid down by the existing contract between the Fund and its members, constituted by the Articles. Mr Moss suggests that the redemption is a fresh contract of sale, albeit on the

terms of the Articles. It is not necessary for the Court to resolve this debate, since it does not change the analysis as to any of the points in issue.[137]

140.     Where Mr Moss and I disagree is over whether, as the Liquidators contend with the support of Mr Moss (Second Moss Declaration at ¶¶ 155, 157), a Redemption Payment is a separate transaction distinct from the Redemption. It is easy to demonstrate that the Liquidators are wrong. Suppose a company enters into a transaction with a supplier to buy goods with delivery and payment to take place immediately. Delivery and payment are part of the transaction. No one could sensibly argue that the company entered into a separate transaction when it made payment or that the supplier entered into a separate transaction when it delivered the goods. The position is the same if the transaction provides for delivery to be made on the following day and payment the day after that. It can therefore be seen that the Liquidators' argument is founded on the false premise that there are separate transactions as a result of the intervals of days or weeks between service of the redemption notice and delivery of the shares on the Dealing Day and between the Dealing Day and payment of the Redemption Price. Provided that events take their ordinary course, as they did, there is only one transaction, as was correctly pleaded in ¶ 164 of the CA Amended Complaint (First Mortimore Declaration at ¶ 171).

141.     Of course, it might be different if some event, such as the exposure of the BLMIS fraud, occurred during one or other of the intervals. If that event occurred before the Dealing Day, the determination of NAVs would be suspended under Article 11(4) and the Redemption could not proceed (Article 10(1)(e)). If that event occurred between the Dealing

---

[137] It is interesting to note that before the EC Court of Appeal, the Funds argued the opposite of what Mr Moss argues now. Then Sentry argued that the contract was contained in Article 10 and that the Redemption did not constitute a new contract; see the judgment of the EC Court of Appeal at §§ 53, 60, 75,79 (Exhibit G to Mr Hare's Declaration). The issue was not pursued before the Privy Council; see Sentry's case on the good consideration appeal at ¶¶ 19, 20 (Exhibit M to Mr Hare's Declaration).

Day and payment of the Redemption Price, the directors would have to decide whether the Fund could make the payment, having regard to its other debts and liabilities. Any decision to pay in those circumstances might well be regarded as a separate transaction, as I have explained (paragraph 137 above and First Mortimore Declaration at ¶ 164), but that issue does not arise in relation to any of the transactions referred to in the Amended Complaints.[138]

### (3)    The Liquidators' reliance on hindsight

142.    Mr Moss takes the position that, in applying sections 245 and 246 of the BVI Insolvency Act, hindsight knowledge may be used without restriction or limit. This is contrary to BVI law. I will deal with Mr Moss's specific arguments with respect to the use of hindsight as they arise in my discussion of unfair preference and undervalue transaction. In short, I will demonstrate that, when looking back at a past transaction, the court puts itself into the position of a reasonable observer of the circumstances of the company <u>at the time of the transaction</u> to determine whether (i) it was then able to pay its debts, (ii) the transaction was entered into in the ordinary course of business (or was a good faith business transaction), and (iii) the transaction was at an undervalue.

143.    I will also explain why my analysis is not "*directly contrary*" to the decision of the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*, as Mr Moss suggests (Second Moss Declaration at ¶ 158). As I will show, in *Brewin Dolphin*, Lord Scott used evidence of subsequent events only to confirm the value of consideration under a transaction, which, at the date of the transaction was known to be uncertain and precarious; *i.e.* to validate what would have been seen to be the value at the time of the transaction (see paragraph 167 below).[139]

---

[138] Mr Moss's suggestion in the Second Moss Declaration at ¶ 151, for dealing with the problem of a non-trading individual debtor under section 401 of the BVI Insolvency Act, is that the individual debtor should be treated as if he carried on business even if he did not. With respect, this does far more violence to the statutory language than my suggestion and I cannot agree with it.

[139] [2001] 1 WLR 143 at § 26.

### 8.    THE UNFAIR PREFERENCE CLAIMS

144.    As I explained in the First Mortimore Declaration (¶¶ 145, 175), a claim in relation to an unfair preference under section 245 can only be brought if the transaction entered into by the company (i) gives a preference to a creditor, (ii) is an insolvency transaction, in that the company was then, or became in consequence of the transaction, unable to pay its debts as they fell due, (iii) is entered into during the vulnerability period, which is two years if the preference is given to a connected person or 6 months if the preference is given to any other person, and (iv) did not take place in the ordinary course of business. Mr Moss does not dispute this, but argues incorrectly that the Defendant Institutions were creditors at the time the Redemptions were entered into, that at the relevant time the Funds were unable to pay their debts as they fell due, and that the transactions were not entered into in the ordinary course of the Funds' businesses. I shall address each point in turn below.

### (1)    The Defendant Institutions were members and not creditors when the Redemptions were entered into

145.    This issue is discussed in the First Mortimore Declaration at ¶¶ 180-186 and in the Second Moss Declaration at ¶¶ 163-181. In considering this issue, it is helpful to identify the three relevant time periods: (i) the period up to and including receipt by the Fund of the redemption notice served by or on behalf of the Defendant Institution, which was when the Redemption transaction was entered into ("**Period 1**"), (ii) the period after receipt of the notice until the relevant Dealing Day, when the Funds actually redeemed the shares from the Defendant Institution, which then ceased to be a member ("**Period 2**"), and (iii) the period between the Dealing Day and payment of the Redemption Price ("**Period 3**").

146.    In the Second Moss Declaration at ¶ 163, Mr Moss states that in Period 1 each Defendant Institution was a member:

> "*[T]he Defendant Financial Institutions were members/shareholders at the time they gave notice to redeem and started the redemption process.*"

Therefore, the Defendant Institution was a member, not a creditor, when the Redemption transaction was entered into with the Fund. However, Mr Moss seems to argue that at the moment the Defendant Institution submitted the redemption request—and thus entered into the Redemption transaction—the Defendant Institution was somehow already "*also a contingent creditor*." (Second Moss Declaration at ¶ 163). This does not make any sense, as it cannot be that a Defendant Institution submitted the redemption request as a contingent creditor when it was indisputably a member. If the Fund went into liquidation before receipt of the redemption notice, the Defendant Institution would rank as a member in the liquidation, and it could not be argued that it was a contingent creditor at such time. Mr Moss's argument must be that the act of entering into the Redemption transaction, by submitting the redemption request, somehow transformed the Defendant Institution into *both* a member *and* a contingent creditor. This of course fails to alter the fact that the Defendant Institution was a member, not a creditor, when it entered into the Redemption transaction by serving notice on the Fund and could not acquire any rights under the Redemption procedure until after the notice had been received, at which point Period 2 begins (paragraph 148 below).

147.    Mr Moss and I agree that in Period 3, which under Article 10(1)(c) would normally last about 30 days, the Defendant Institution would be a creditor (Second Moss Declaration at ¶ 163, where he says that the Defendant Institutions "*became immediate creditors <u>once the redemption process took place</u>*" (emphasis added)). From the Dealing Day, the Defendant Institution ceased to be a member and was entitled to be paid the Redemption Price. Thus, during Periods 1 and 3 the Defendant Institution was either a member or creditor, but it was not simultaneously both. If the Fund went into liquidation during Period 3, and if *Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd* is the governing BVI authority, the Defendant Institution would rank as a creditor for the unpaid Redemption Price, but its claim

would be subordinate to ordinary creditors under section 197 of the BVI Insolvency Act.[140] On the basis that the transaction was entered into when the redemption notice was received, Period 3 starts too late for the Defendant Institution to be a creditor for the purposes of section 245(1). On the other hand, if as Mr Moss contends and I disagree, the Redemption Payment was a separate and distinct transaction entered into when payment was made, rather than performance of the existing transaction entered into when the redemption notice was served, then the Defendant Institution would have been a creditor immediately before payment.

148.    The period on which we disagree is Period 2. Under Article 10(1)(a), this period may last between at least 15 days and about one month, depending on when the notice to redeem was given.[141] Exploring the status during Period 2 of a member who has requested redemption is not helpful, since the period begins after the Redemption transaction was entered into, when the requesting party was a member, and it ends before the requesting party became a creditor, entitled to receive the Redemption Payment. If a Fund went into liquidation during Period 2, a Defendant Institution who had served a redemption notice would rank as a member, because (i) it would still be a member when the Fund went into liquidation, its shares not having been redeemed and its name not having been removed from the register of members, and (ii) the Redemption could not be completed and the Defendant Institution could never acquire the right to payment of the Redemption Price. Apart from anything else, the determination of NAV would be suspended pursuant to Article 11 and the Defendant Institution would have no right to have its shares redeemed (Article 10(1)(e)). The Defendant Institution could not claim that it was a "contingent" creditor ranking behind ordinary creditors, but before members who had not served a redemption notice, because the contingency of becoming entitled to payment of the Redemption Price could never occur.

---

[140] HCVAP 2011/11, EC Court of Appeal. See my comments on this case in the First Mortimore Declaration at ¶ 185 footnote 165.

[141] See definitions in Article 1 of "*Dealing Day*," "*Dealing Time*" and "*Valuation Day*."

149.    In ¶ 164 of the Second Moss Declaration, Mr Moss says that I take too narrow a view of the time when the transaction was entered into. But the focus on entry into the transaction is dictated by the language of subsection 245(1), and that focus is supported by the need to determine (i) whether it was an insolvency transaction, in that it was entered into when the Fund was insolvent (subsections 244(2), (3) and 245(1)(a)) and, (ii) whether it was entered into within the vulnerability period (subsections 244(1) and 245 (1)(b)).

150.    In ¶¶ 165 and 166 of the Second Moss Declaration, Mr Moss addresses my example of a company, in the ordinary course of business, acquiring goods from a new supplier on 7 days' credit. I said that, when entered into, this would not be a transaction with a creditor for the purposes of subsection 245(1) and that payment would be performance of the sale and purchase contract (First Mortimore Declaration at ¶ 182). If the directors appreciated the company's perilous financial position before payment became due, but nevertheless made the payment, a court, applying BVI law, would have to consider the issues discussed in paragraphs 134 and 137 above. Mr Moss then considers how my example would stand if the preference provision in section 239 of the English Insolvency Act were applied. This is irrelevant, because the position under English law is entirely different, since the payment would give a preference to a creditor (subsections 239(2) and (4)(a)) and there is no need to identify the timing of the transaction entered into by the company that gives a preference.

151.    In ¶¶ 164 and 167-171 of the Second Moss Declaration, Mr Moss also says that the Fund became a contingent creditor upon the Redemption transaction being entered into. He refers to *Sibun v Pearce*,[142] which concerned the interpretation of the rules of a building society incorporated under applicable building societies legislation. Under those rules, a member who had given notice of withdrawal, but had not been paid, was held to be a member who was entitled to vote on a resolution for dissolution. The withdrawing member was also a creditor,

---

[142] (1890) 44 Ch D 354, English Court of Appeal.

but, as Lindley LJ said, he was not an ordinary creditor, since he would have a right to be paid before the surplus assets were distributed among members who had not given notice of withdrawal. Mr Moss says that *Sibun v Pearce* was adopted by the EC Court of Appeal in the *Monarch Pointe* case. This is correct, but *Monarch Pointe* was a Period 3 case (see paragraph 147 above). In a recent decision of the Privy Council,[143] Lord Mance had this to say about *Sibun v Pearce*:

> "*In Sibun v Pearce (1890) 44 Ch D 354 the question was whether a member who had given a notice of withdrawal which had expired remained a member for the purposes of a requirement that any resolution for winding up the society be with the assent of three-fourths of the members. The question turned upon the construction of a statute — which Lindley LJ said was "less obscure than usual" (page 369) — and of rules made under it. The court held that the member remained, in Lindley LJ's words, "a member who has given notice of withdrawal, and is entitled to payment", and should be taken into account when deciding whether the necessary three-fourths majority had been met (page 371). The case merely underlines the fact that all depends upon the particular provisions or rules.*"[144]

152.    Even if, immediately after the notice has been received and the Redemption transaction entered into, the Defendant Institution could be described as a contingent creditor (as was the case with my example of the new supplier before he delivered the goods), the description would achieve nothing to support the Liquidators' argument because (i) it is too late to make the Defendant Institution a creditor for the purposes of section 245, the transaction having already been entered into, (ii) if the Fund went into liquidation before the Dealing Day, the Defendant Institution would remain a member and the contingency would fall away (paragraph 148 above), and (iii) if the Fund did not go into liquidation until after the Dealing Day, so that Period 3 starts, the Defendant Institution would become a creditor and would cease to be a member (paragraph 147 above).

---

[143] *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33, Privy Council on appeal from the Cayman Islands Court of Appeal.

[144] At § 38.

153.    At ¶¶ 173-180, Mr Moss engages in a lengthy discussion about the two EC Court of Appeal cases, *Westford* and *Monarch Pointe*, which I had mentioned in the First Mortimore Declaration at ¶ 185 footnote 165. It remains my opinion that these cases are unlikely to assist the Court, because neither concerned entry into a transaction for the purposes of section 245. *Westford* concerned the standing of an unpaid redeemed former member to apply for the appointment of liquidators and *Monarch Pointe* concerned whether the claims of redeemed former members for unpaid redemption proceeds took priority over the claims of continuing members in a distribution of surplus. Nor is it necessary for the Court to consider what effect the later *Monarch Pointe* decision has on *Westford*.

### (2)    No insolvency transaction: the Funds were able to pay their debts as they fell due

154.    This issue is addressed in the First Mortimore Declaration at ¶¶ 187-212 and in the Second Moss Declaration at ¶¶ 182-221. Mr Moss and I agree on the following points:

(a)    for the purposes of preference and undervalue claims, the Fund must at the time when the transaction is entered into be unable to pay its debts as they fall due, which is a "cash-flow" or "commercial test";

(b)    the test is an objective one (so it does not matter what the directors subjectively may have thought the financial position to be);[145]

(c)    in interpreting subsection 8(i)(c)(ii) of the BVI Insolvency Act about cash-flow insolvency, a BVI Court would follow the three leading English authorities, which are *Re Cheyne Finance plc*,[146] *BNY*

---

[145] To be clear, I do not agree that an objective test incorporates hindsight knowledge. There is no support for that in English or BVI law.

[146] [2008] 2 All ER 987, English High Court.

*Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc*,[147] and *Re Casa Estates (UK) Ltd*;[148]

(d)     under those authorities, the cash-flow test looks not just to the present, but also to the reasonably foreseeable future; but how far into the future the court will look depends on all the circumstances, especially the nature of the company's business;[149] and

(e)     even if, at the relevant time, a company is able to pay its debts as they fall due, in an appropriate case, the court should go on to inquire how it is managing to do so.[150]

155.     The principal areas of dispute between Mr Moss and myself concern:

(a)     the interpretation of subsection 8(1)(c)(ii) of the BVI Insolvency Act and, in particular, (i) whether "debts" in that subsection are restricted to liquidated monetary obligations, and (ii) whether the definition of "debt" in Rule 13.12(1) of the English Insolvency Rules 1986 ("**English IR 13.12**")[151] would be applied to subsection 8(1)(c)(ii) of the BVI Insolvency Act;

(b)     what assets and debts should be taken into account by a court considering the question of whether, at the relevant time, a company was unable to pay its debts as they fell due and, in particular, (i) how far into

---

[147] [2013] 1 WLR 1408, UK Supreme Court.

[148] [2014] 2 BCLC 49, English Court of Appeal.

[149] *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49 at § 27(ii), per Lewison LJ.

[150] *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49 at § 30, per Lewison LJ (the last sentence of the quotation in the Moss Second Declaration at ¶ 195).

[151] As from 6 April 2017, English IR 13.12 is replaced by Rule 14.1 of the Insolvency Rules (England and Wales) 2016.

the future the court may look, and (ii) the treatment of unknown assets

and debts;

(c)     what matters should be taken into account by a court considering the

question of how, at the relevant time, a company was managing to pay

its debts as they fell due; and

(d)     our respective explanations of how the law would be applied to the facts

stated in the Amended Complaints.

*(a)     Interpretation of subsection 8(1)(c)(ii)*

156.    The phrase "*the company is unable to pay its debts as they fall due*" in

subsection 8(1)(c)(ii) necessarily involves identifying some debt or debts which are due or

which will become due within the appropriate time frame and which the company cannot pay

or, on the balance of probabilities, will be unable to pay. Subject to what I say below about

unknown liabilities and hindsight, I agree that the court would take into account liabilities of

the debtor at the relevant time which would mature into debts within the appropriate time frame

and which the debtor will be unable to pay.[152]

157.    With respect, Mr Moss's contention that the English IR 13.12 is relevant to the

interpretation of subsection 8(1)(c)(ii) is clearly wrong. First, the BVI Insolvency Act does not

contain a definition of "*debt*" and has not adopted the definition of "*debt*" in the English IR

13.12(1), which Mr Moss quotes in ¶ 184. Instead, as I noted in the First Mortimore Declaration

at ¶ 190, under the BVI Insolvency Act, the word "*debt*" has its normal meaning, but section

10 of the BVI Insolvency Act gives "*liability*" a defined meaning. For this purpose, subsection

10(1) adopts, with modifications, the language of the English IR 13.12(4), which defines

"*liability*" in any provision in the English Insolvency Act or Rules, and subsection 10(2) adopts

---

[152] An example of this is *Bank of Australasia v Hall* (1907) 4 CLR 1514, High Court of Australia (see First
Mortimore Declaration at ¶ 194 footnote 173) and which was cited in the *Cheyne* case at § 43.

the language of the English IR 13.12(3) in relation to the range of liabilities covered by subsection 10(1). Since subsections 10(1) and (2) are concerned with the definition of liabilities, not debts, subsection 10(2) omits the reference to "*debt*" in English IR 13.12(3). Subsection 10(1) adds at the end "*and 'liability' includes a debt*" to make it clear that the wider word "*liability*" includes the lesser word "*debt*." I do not understand how Mr Moss can extract from that the proposition that "*a debt can also be for an unliquidated sum.*" (Second Moss Declaration at ¶ 188). Such a proposition departs from the normal meaning of the word "debt" and its application in insolvency legislation. An unliquidated sum is not payable within subsection 8(1)(c)(ii) unless and until it matures into a liquidated debt.

158.   Second, none of the three English cases mentioned in paragraph 154(c) above that considered the meaning of "*the company is unable to pay its debts as they fall due*" in subsection 123(1)(e) of the English Insolvency Act ever mentioned the English IR 13.12. Instead, they referred to the statutory antecedents of the subsection and cited and analysed English and Australian case law to interpret that subsection. I suggest that the reason for this is that the definitions in the English IR 13.12 support Rule 12.3 of the English Insolvency Rules,[153] which identifies provable debts in, among other things, the winding up of a company. These rules are included in the English Insolvency Rules, pursuant to section 411 and schedule 8, paragraph 12 of the English Insolvency Act, as "*provisions as to the debts that may be proved in a winding up.*" The definition of inability to pay debts in section 123 of the English Insolvency Act has a different function. It is used to define the circumstances in which a company may be wound up by the court (or enter administration) and prior transactions may be unwound as, for example, transactions at undervalue or preferences.[154] Section 8 performs a similar function in the BVI Insolvency Act.

---

[153] As from 6 April 2017, IR 12.3 is replaced by Rule 14.2 of the Insolvency Rules (England and Wales) 2016.

[154] My opinion that the English IR 13.12 supports IR 12.3 and is concerned with proofs of debt in a liquidation is confirmed by the judgment of David Richards J in *Re T&N Ltd* [2006] 1 WLR 1728 at §§ 70-75. These rules

159.     Third, if a debt can be for an unliquidated sum, it defeats the statutory purpose

of subsection 244(3), which is to restrict the circumstances in which a preference or undervalue

claim can be made to cases where the company is insolvent on a cash-flow basis only. This is

because it would enable liabilities for unliquidated amounts within section 10 to be taken into

account in subsection 8(1)(c)(ii), destroying the distinction between that subsection and

subsection 8(1)(c)(i).

*(b)     Assets and debts to be taken into account*

160.     There is a significant difference in the nature of the court's inquiry into a

company's inability to pay its debts on a cash-flow basis, depending on whether it is a

contemporary and forward looking inquiry for the purpose of deciding whether the company

should be wound up or certain contractual enforcement steps may be taken (*Cheyne* and

*Eurosail*), or whether it is a retrospective inquiry for the purpose of a preference or undervalue

claim (*Casa Estates* and the Australian cases *Bank of Australasia v Hall* and *Lewis v Doran*[155]).

In the contemporary and forward looking inquiry, the court considers all the evidence placed

before it by the parties concerning the company's circumstances and business. In the

retrospective inquiry, the court puts itself in the position of the "*reasonable observer*," looking

at all the circumstances of the company and its business at that past date; per Owen J in *The

Bell Group Ltd v Westpac Banking Corp*.[156]

---

can be traced back to sections 611 and 612 of the English Companies Act 1985 (which have a long history going back to 1862), read with section 30 of the English Bankruptcy Act 1914, which were about proof of claims ranking in the liquidation. On the other hand, section 123 of the English Insolvency Act derives from section 518 of the English Companies Act 1985 (which also has a long history going back to 1862). Both these sections provide the definition of inability to pay debts for the court's power to wind up a company, but the Insolvency Act 1986 extended the function of section 123 to supplying that definition for the new sections about adjusting prior transactions (undervalue transactions and preferences).

[155] *Lewis v Doran* concerned an alleged uncommercial transaction within section 588 of the Australian Corporations Law and whether at relevant times the company was insolvent in that it was unable to pay its debts as and when they became due and payable (section 95A).

[156] [2008] WASC 239 at § 1119, Western Australia Supreme Court (First Mortimore Declaration at ¶ 195).

161.    Where, at the relevant date, a known debt or liability is not yet payable, the court determines whether the time for payment will occur in the reasonably near future. To this extent, I agree with Mr Moss (at ¶ 193). When the court is conducting a contemporary and forward looking examination of a company that is in receivership and running off its affairs, as was the position in the *Cheyne* case, the court may look a year or so ahead with reasonable certainty to decide, on the balance of probabilities, whether the company is now unable to pay its debts as they fall due. On the other hand, where the company is carrying on its business, the reasonably near future will be shorter, because attempting to look further ahead would involve speculation which, as Lord Walker explained in *Eurosail*, is not permitted under the cash-flow test.[157]

162.    The position is different when the court is conducting a retrospective examination. Then, the court examines the circumstances of the company at the relevant time, taking into account debts that would become due for payment in what was then the reasonably near future, but the inquiry is not open-ended and does not permit the court to consider what were then unforeseen events, because that would involve impermissible speculation. Nor does the court take into account liabilities that were "*properly unknown or seen in lesser amount at the relevant time*"; see the Australian case *Lewis v Doran*.[158] In the *Cheyne* case, Briggs J

---

[157] In *Eurosail* at ¶ 37, Lord Walker compared the cash-flow test in subsection 123(1)(e) of the English Insolvency Act with the balance sheet test in subsection 123(2) (comparable to subsections 8(1)(c)(ii) and (i) of the BVI Insolvency Act respectively) and said that:

"*the 'cash-flow' test [in subsection 123(1)(e)] is concerned, not simply with the petitioner's own presently-due debt, nor only with other presently-due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business …. The express reference to assets and liabilities [in subsection 123(2)] is in my view a practical recognition that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test.*" (my insertions in square brackets)

[158] [2005] NSWCA 243 at § 103, New South Wales Court of Appeal (First Mortimore Declaration at ¶¶ 193-194).

endorsed *Lewis v Doran* and added, "*In short, it is a fact sensitive question depending on the nature of the company's business and, if known, of its future liabilities.*"[159]

163.    In the English Court of Appeal in *Casa Estates*, Lewison LJ conducted a retrospective examination of the company's affairs to determine whether, at the times relevant to the liquidator's undervalue claims, the company was able to pay its debts as they fell due and, if so, how it was able to do so. Casa Estates' principal business was that of introducing investors to properties being developed in Dubai. It received deposits from investors that it mixed with its own funds, misused and did not pass on to the developers in Dubai. In late 2008, the Dubai property market suffered a "*sudden and not generally anticipated*" collapse, which precipitated the liquidation of Casa Estates.[160] Lewison LJ agreed with the judges below that Casa Estates was under an immediate liability to account to investors for money received from them and remained under that liability unless and until it was discharged from it by paying the money to the developers in Dubai. The present liabilities to account to investors were debts of which account should be taken when determining whether, at the relevant dates, Casa Estates was insolvent under the cash-flow test.[161] Lewison LJ's analysis of the circumstances and business of Casa Estates at the relevant dates is entirely consistent with the examination conducted by a "*reasonable observer*." Critically, he did not take into account the later collapse of the Dubai property market that exposed the inability of Casa Estates to pay its debts at earlier times.[162]

164.    At ¶¶ 201-204 of the Second Moss Declaration, Mr Moss takes issue with the approach in the Australian cases and wrongly contends that the inquiry permits hindsight

---

[159] Emphasis added. [2008] 2 All ER 987 at § 50.

[160] Lewison LJ's judgment at § 8-10,17.

[161] For the facts see the judgment of Lewison LJ (with whom McFarlane and Sullivan LJJ agreed) at §§ 11, 18, 34-37.

[162] Lewison LJ's judgment at § 17.

without limit. I would respectfully suggest that Mr Moss fails to take into account the different natures of the inquiries; the inquiry in *Eurosail* was contemporary and forward looking, whereas the Liquidators' case in these proceedings involves a retrospective inquiry. In *Eurosail*, there was no need to imagine what the reasonable observer might consider, because the court could take into account all the facts about the company's circumstances revealed by the evidence. In a retrospective inquiry under BVI law, the court must bear in mind that, under the statutory restriction in sections 244(3) and 8(1)(c)(ii), the inquiry is into past cash-flow insolvency, not balance sheet insolvency. *Casa Estates* and the Australian cases show how that may be achieved.

165.    Further, the *Lewis v Doran* approach, excluding from the inquiry unknown debts, is supported by later English authority and, in my opinion, would be followed by a BVI Court. First, as noted in paragraph 162 above, it was approved by Briggs J in *Cheyne*. In *Eurosail*, Lord Walker commended Briggs J's judgment and noted his reference to Australian authority.[163] Second, it is consistent with Lord Walker's conclusion that speculation plays no part in the cash-flow insolvency test. Third, in *Evans v Jones*,[164] the English Court of Appeal excluded from a retrospective inquiry as to balance sheet insolvency a contingent asset that, at the relevant date, was an "*unknown unknown*," saying that the statutory test under section 123 should be applied with "*regard to commercial reality*" and the court should not make "*counter-factual assumptions*." Fourth, there is no case, of which I am aware, that supports Mr Moss by holding that the court, conducting a retrospective examination into cash-flow insolvency, is

---

[163] [2013] 1 WLR 1408 at § 33, 34.

[164] [2017] Ch 1, English Court of Appeal, at §§ 20-22, per Lewison LJ (with whom the other Lords Justices agreed). The contingent asset was a claim to recover an unlawful dividend. Section 123 does not allow contingent assets to be taken into account, but, in any event, as a matter of commercial reality the claim had no value at the relevant time (§§ 22-24). If it was left out of account, the company was unable to pay its debts on a balance sheet basis and it was not necessary for the Court of Appeal to form a concluded view about the value of a known contingent liability at the relevant dates; see discussion about hindsight at §§ 18, 23, 26.

entitled to treat itself as having knowledge of everything that has happened since the date of the relevant transaction.

166.    In ¶ 203 of the Second Moss Declaration, Mr Moss seems to suggest that the Australian test (*Lewis v Doran* and *Bell Group*) is partly subjective. I do not agree. In *Bell Group*, Owen J said that the court puts itself in the position of "*a reasonable observer at the relevant date, looking at all of the circumstances in which the company found itself.*" (First Mortimore Declaration at ¶ 195). Such an observer does not take into account assets that the company did not know it had (*Evans v Jones*). The observer takes into account the company's debts and "*if known, future liabilities*" (*Cheyne*), but not liabilities that were then "*properly unknown*" (*Lewis v Doran*), and he does not engage in speculation (*Eurosail*). *Casa Estates* illustrates what is meant by "*properly unknown*," because, in that case, the company was subject to a present liability to account to its investors unless and until it paid their money to the developers. Whether or not the directors appreciated that the company was subject to that liability is irrelevant, because it would have been apparent to the reasonable observer. Accordingly, the test is objective and commercially realistic, consistent with the cases on ordinary course of business that I cited in the First Mortimore Declaration at ¶¶ 221 and 222.

167.    In ¶¶ 205-210 of the Second Moss Declaration, Mr Moss disputes my opinion that, when the court is looking back to an earlier date, it does not resort to hindsight. The phrase "*without intrusion of hindsight*" that I used comes from the judgment of Giles JA in *Lewis v Doran* (First Mortimore Declaration at ¶ 194). In his argument, Mr Moss relies heavily on *Phillips v Brewin Dolphin Bell Lawrie Ltd.*[165] This case concerned a claim by the liquidator that the company had sold the shares in its wholly-owned subsidiary (AJB), which carried on a stockbroking business, at an undervalue within section 238 of the English Insolvency Act. The consideration for the sale included an obligation by the purchaser's parent to pay the

---

[165] [2001] 1 WLR 143, English House of Lords.

company £312,500 per annum over four years under a sub-lease of computer equipment that had been leased on terms that the equipment could not be assigned or sub-let without the consent of the lessors. The lessors' consent to the sub-lease was not obtained, so that, at the time of the transaction, the prospects for the company receiving the £312,500 were uncertain and precarious. Lord Scott held that the court should take into account what had actually happened (repossession of the computer equipment shortly after the transaction), with the result that a nil value was attributed to the obligation to pay £312,500 under the sub-lease and there had been a transaction at undervalue.[166] In the passage quoted in the Second Moss Declaration at ¶ 206,[167] Lord Scott made it clear that he used hindsight for the particular purpose of confirming the value of consideration, which was known at the time to be uncertain and precarious, in a transaction at undervalue case and that in other contexts it might not be appropriate to do so. Lord Scott went on to say that his conclusion, that the covenant was worth nothing, was confirmed when he considered the position at the time of the transaction:

> *"After all, if following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant."*

In *Principles of Corporate Insolvency Law*, Professor Goode says that Lord Scott was not applying a hindsight test, but was relying on subsequent events to validate what would anyway have been the perception of the value of the sub-lease at the time of the transaction.[168] Accordingly, *Brewin Dolphin* (i) is not a case on cash-flow or even balance sheet insolvency, (ii) does not involve the valuation of an asset, liability or debt of a company that existed before the impugned transaction, (iii) restricts the use of hindsight to the valuation of the consideration

---

[166] The speech of Lord Scott at §§ 5, 21, 24, 26.

[167] At § 26.

[168] At § 13-32.

passing under the impugned transaction to the situation when that element of the consideration is known at the time to be uncertain and precarious, and (iv) recognises that in other contexts the resort to hindsight may be inappropriate.[169] Further, it sheds no light on the treatment of liabilities that were properly unknown at the relevant time.

168.    At ¶¶ 199 and 200 of the Second Moss Declaration, Mr Moss does not rely on the preference and fraudulent claims of the BLMIS Trustee on which the BLMIS Trustee obtained judgments against the Funds for over US$3.2 billion.[170] Instead, Mr Moss refers to the potential claims of investors and other creditors against the Funds.[171] This involves making "*counter-factual assumptions*" that Lewison LJ said were inappropriate to the application of the statutory insolvency tests, which he said should be applied with "*regard to commercial reality*."[172] The assumptions are that the claims were known to the Funds and the BLMIS investors and other creditors (which they were not), that the claims would have been pursued before the BLMIS Ponzi scheme was exposed (which they were not) and that they would be successful, in the sense of being admitted to proof in the liquidations of the Funds (which is not alleged in the Amended Complaints).[173] If a BVI Court concluded that these claims would have been properly unknown to a reasonable observer looking at the circumstances of the Funds at the relevant times, it would find that the Funds were able to pay their debts as they fell due.

[169] As to (iv), see *Joiner v George* [2003] BCC 298 at § 71, quoted in the Second Moss Declaration at ¶ 208).

[170] The CA Amended Complaint at ¶¶ 12, 13.

[171] The CA Amended Complaint at ¶¶ 162, 175.

[172] *Evans v Jones* [2017] Ch 1 at §§ 23, 24.

[173] The Amended Complaints do not quantify the claims of BLMIS investors or other creditors against the Funds or allege that they have been admitted in the Funds' liquidations. If, as seems probable, they overlap with the BLMIS Trustee's judgments against the Funds, the rule against double-proof would prevent the claims of investors and other creditors from being admitted in competition with the BLMIS Trustee's judgments, if the latter have been admitted.

(c)    *How the company is managing to pay its debts as they fall due*

169.    At ¶ 194 of the Second Moss Declaration, Mr Moss quotes a passage from the judgment of Lewison LJ in *Casa Estates*, where he says "*a realistic examination may reveal that a company is on any commercial view insolvent, even though it may continue to pay its debts for the time being.*" At ¶ 195, Mr Moss quotes from the next paragraph of Lewison LJ's judgment, the last sentence of which explains that, in an appropriate case, the court should go on to inquire how the company is managing to pay its debts as they fall due. A retrospective examination of the affairs of *Casa Estates* at the relevant dates revealed that the way it conducted its business, including the misapplication of investors' money, meant that it was getting into ever deeper financial difficulties and could not pay its debts on a cash-flow basis.

170.    At ¶¶ 195-198 of the Second Moss Declaration, Mr Moss refers to Lewison LJ's example of a company that operated a Ponzi scheme. An examination into the circumstances of such a company at any date while it operated the scheme would reveal that it was cash-flow insolvent, since that is the inevitable consequence of such a scheme. Mr Moss recognises that the relevant inquiry into the Funds' circumstances is different, because the Funds did not operate a Ponzi scheme. A reasonable observer of the Funds' circumstances at the relevant times, considering how they were able to pay their debts at those times, would have found that they could do so without difficulty from their own cash resources and from normal redemption payments made by BLMIS. If such a reasonable observer would not have known of the BLMIS Ponzi fraud, he could not conclude that, as a matter of commercial reality, at the relevant dates, the Funds, which themselves were not Ponzi schemes, were insolvent on a cash-flow basis.

171.    It may be helpful to consider what would have been the position if, rather than being a Ponzi scheme, BLMIS had been a machinery manufacturer and the Fund its distributor. Business carried on normally for several years until it was discovered for the first time that a material used in the manufacture of the machines caused cancer. As a result, BLMIS and the

Fund became subject to massive personal injury claims and went into liquidation. If the Fund had entered into a transaction at undervalue within two years of the liquidation, but at a time when there was no hint of the cancer problem, the personal injury liabilities would not be taken into account in determining whether the Fund was unable to pay its debts as they fell due at the time of the transaction.

*(d)    Application of BVI law to the facts stated in the Amended Complaints*

172.    At ¶¶ 211-221, Mr Moss takes issue with what I have said about the facts stated in the Amended Complaints in relation to the question of whether, at the times of the Redemptions and Redemption Payments, the Funds were unable to pay their debts as they fell due. The Amended Complaints describe their circumstances at those times, including reference to the claims of the BLMIS Trustee that later emerged, as well as claims by investors and other creditors which were not made at those times. If, on the application of BVI law to the facts stated in the Amended Complaints, those claims are excluded from the inquiry into the Funds' circumstances at those times, the facts stated in the Amended Complaints indicate that, at the relevant dates, the Funds were able to pay their debts as they fell due. I recognise that it is then a matter for the Court to decide whether, having regard to any statutory presumption, the Amended Complaints should be allowed to proceed or should be dismissed.

**(3)    Ordinary course of business**

173.    This issue is addressed in the First Mortimore Declaration at ¶¶ 213-227 and in the Second Moss Declaration at ¶¶ 222-232, where Mr Moss again applies impermissible hindsight to support the argument that the relevant transactions did not occur in the ordinary course of business. Mr Moss and I agree that (i) whether a transaction took place in the ordinary course of business is to be judged objectively, and (ii) normal good faith commercial

transactions by an insolvent party will not be invalidated. The principal issues over which we disagree are:

(a)     the approach taken by a BVI court to the assessment of whether a transaction took place in the ordinary course of business;

(b)     whether hindsight may be used in the assessment;

(c)     whether investing in and distributing returns from a company that was in fact operating a Ponzi scheme could ever be regarded as in the ordinary course of business; and

(d)     the application of BVI law to the facts stated in the Amended Complaints.

(a)     *The approach of the BVI Court*

174.    In my opinion, the BVI Court would take the same approach as would an English Court and would be guided by the authorities cited in the First Mortimore Declaration (¶¶ 219-223). When I referred to the court taking a broad approach (First Mortimore Declaration at ¶ 224), I meant that, in keeping with those authorities, the court would assess the transaction in the general flow of the company's business and in the factual setting at the time. The court would recognise that the ordinary course of business exception applies to prevent normal business transactions from being stultified.

175.    At ¶ 226 of the Second Moss Declaration, Mr Moss cites a further passage from the judgment of Gault J in *Countrywide Banking Corporation Ltd v Dean*,[174] a decision of the Privy Council. Gault J's words of caution, in the passage cited by Mr Moss, were followed by a paragraph in which Gault J rejected submissions of one of the parties and then by the two paragraphs from which I quoted at ¶ 221 of the First Mortimore Declaration. It seems clear that the statements made in those two paragraphs, about the approach to the assessment of whether

---

[174] [1998] AC 338, 349, Privy Council on appeal from the Court of Appeal of New Zealand.

a transaction was in the ordinary course of business, were ones that Gault J considered could be made, notwithstanding his earlier words of caution. As such, they provide valuable guidance for a court considering an issue under subsection 245(2) of the BVI Insolvency Act.

176.    That was how Foster J saw them in *Re Freerider Ltd*,[175] a Cayman Islands case, noted by Mr Moss in the Second Moss Declaration (at footnote 58 to ¶ 227). After quoting the passages from *Countrywide*, quoted by Mr Moss and me, Foster J said that "*certain key points were made clear*" by *Countrywide*:

> "*(a)    the transaction must be examined in the circumstances in which it occurred;*
>
> *(b)    the transaction must be such that an objective observer would view it as having taken place in the ordinary course of business;*
>
> *(c)    the focus of the enquiry must be on the ordinary operational activities of businesses, not responses to abnormal financial difficulties; and*
>
> *(d)    prior practices of the company will be a relevant consideration.*"[176]

In my opinion, those guidelines may properly be drawn from Gault J's judgment in *Countrywide*.

177.    In footnote 58 and ¶ 229b to the Second Moss Declaration, Mr Moss refers to another Cayman Islands case, *Re Wyser-Pratte Eurovalue Fund Ltd*.[177] The issue in that case was whether the company, which had operated as a feeder fund, should be wound up by the court on the ground that, by adopting a wind-down and compulsory redemption plan, the company had therefore ceased to carry on its investment business and that the substratum of its business had failed. I would respectfully agree that such a wind-down would not occur in the ordinary course of that company's business and that investors should not have anticipated that it would. But this case offers no guidance on whether a regular transaction, undertaken while a

---

[175] [2010] (2) CILR 154, Grand Court of the Cayman Islands.

[176] At § 15.

[177] [2010] (2) CILR 194, Grand Court of the Cayman Islands. The quotations from the judgment of Jones J are in fact from §§ 28 and 23, not §§ 25 and 20, as suggested in ¶ 227 footnote 58 of the Second Moss Declaration.

company was operating as a going concern, should be characterized as being in the ordinary course of business.

    *(b)*    *Hindsight*

178.    With respect, I do not agree with Mr Moss's contention that hindsight may be used to determine whether a transaction was in the ordinary course of business. In this connection, the court is looking back to consider past transactions. The passages that I have quoted demonstrate that the court should position itself in the circumstances of the company at the time, just as it does when considering whether, at some earlier date, the company was unable to pay its debts as they fell due (paragraphs 160-171 above).

179.    In support of that approach, I refer to these extracts from two passages in *Countrywide* (quoted in the First Mortimore Declaration at ¶ 221):

> *"Plainly the transaction must be examined in the actual setting in which it took place. ... [T]he transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. ... The section therefore requires examination of the actual transaction in its factual setting..."*

I also refer to the judgment of Tipping J in the *Waikato* case (quoted in the First Mortimore Declaration at ¶ 222):

> *"The question is whether, at the time it was made, the relevant transaction was made in the ordinary course of business. ... The observer spoken of in the Privy Council [in Countrywide] is in reality the Court which must look at the circumstances, as objectively apparent at the time of the transaction."*

The court does not use hindsight to take into account matters that would not have been "*objectively apparent*" at the time.

    *(c)*    *The BLMIS Ponzi scheme*

180.    The passages to which I have just referred demonstrate that the court looks at the factual setting at the time of the relevant transaction in order to determine what was then the ordinary course of the company's business. If at that time, the Funds' businesses consisted

of receiving subscriptions, investing in BLMIS and making redemptions, that was the ordinary course. The later discovery of the BLMIS fraud does not affect that.

*(e)*     *Application of BVI law to the facts stated in the Amended Complaints*

181.     What I have said in paragraph 172 above in relation to cash-flow insolvency applies to ordinary course of business, and there is nothing more that I need to add to what I said there and in the First Mortimore Declaration at ¶¶ 225-227.

## 9.     THE UNDERVALUE TRANSACTION CLAIM

182.     In the First Mortimore Declaration at ¶¶ 228-257, I explained that the Redemptions or Redemption Payments (i) were not entered into on terms that provided for the Funds to receive no consideration, (ii) were not made for significant undervalue, and (iii) were good faith business transactions. Since Mr Moss disagrees (Second Moss Declaration at ¶¶ 233-275), I shall address these points below. The issue about cash-flow insolvency, which is also relevant to the undervalue claim, is addressed in paragraphs 154-172 above.

### (1)     No consideration

183.     So far as relevant, subsection 246(1) of the BVI Insolvency Act provides that:

> "*a company enters into an undervalue transaction with a person if*
> *(a)     the company … enters into a transaction with that person on terms that provide for the company to receive no consideration.*"

As I have explained, a mere payment is not a transaction with a person, since it does not involve a dealing (First Mortimore Declaration at ¶¶ 160-161 and paragraph 134 above). It follows that a Redemption Payment is not a transaction with a person for the purposes of subsection 246(1). Rather, the relevant transaction is the Redemption, which provides for payment of the Redemption Price against surrender of the shares. Whatever the value of the shares, the transaction does not provide for the company to receive no consideration; on the contrary, it provides for the Funds to receive the surrender of the shares as consideration.

184.    Mr Moss argues (¶ 235 of the Second Moss Declaration) that, if there were no binding certificates, the Fund received no consideration for its payment and was not obliged to pay the Redemption Price. With respect, that does not address the statutory wording. What matters is the consideration to be received by the Fund as provided for in the Redemption transaction; *i.e.* the surrender of the shares, which had value.

185.    If, contrary to my opinion, the Redemption Payments were transactions within subsection 246(1), separate and apart from the Redemptions, I maintain my opinion that the Funds received consideration for the payments; namely, discharge of their obligations to pay the Redemption Price under the Redemptions. Mr Moss's answer is that, if there were no binding and conclusive certificates, the Funds were not obliged to pay the amount of the Redemption Price. This is an implausible scenario and is not correct, because, under Articles 10 and 11, the Funds were obliged to pay the Redemption Price based on the NAV determined by the directors, pursuant to which the members surrendered their shares to the Funds, which is what happened (paragraphs 14-16 above).

186.    Mr Moss's discussion about real value, as it emerged following the exposure of the BLMIS fraud, is not relevant to the "no consideration" issue. The case is not within subsection 246(1)(a) if the transactions provide for some value to be received by the Fund, as the transactions at issue here did.

**(2)    Significant undervalue**

187.    Mr Moss and I agree that the value of the consideration passing between the parties is to be assessed (i) as at the date of the transaction, and (ii) on an objective basis.

188.    The principal areas of disagreement between us concern:

(a) the relevance of open-market price and arm's-length negotiation;

(b) the matters to be taken into account in assessing value;

(c) whether the Liquidators rely on hindsight and, if so, whether they are
entitled to do so; and

(d) the application of BVI law to the facts stated in the Amended Complaints.

*(a)    The relevance of an open-market price and arm's-length negotiation*

189.    So far as relevant, subsection 246(1)(b) provides that:

"*a company enters into an undervalue transaction with a person if*
*...*
*(b)    the company enters into a transaction with that person for a*
*consideration the value of which, in money or money's worth, is*
*significantly less than the value, in money or money's worth, of*
*the consideration provided by the company.*"

190.    Under the Redemptions, the consideration provided by the Fund was cash, the
Redemption Price. The issue, therefore, is whether the value of the shares that it received in
return was significantly less than the Redemption Price.

191.    Mr Moss argues that there was no market for the shares in the Funds and that
the Redemption Price was not based on arm's-length negotiation (Second Moss Declaration at
¶¶ 239-242, 249, 264). Those are not statutory tests, but matters to which the court may find it
useful to refer in order to test whether the price fixed by the parties under the transaction
represented proper value from the company's point of view. They are not the only tests that
may be considered.

192.    In a case such as this, where the Liquidators ask the Court to go behind the price
determined by the parties, or rather determined under a procedure agreed by them, the Court
may find it helpful to consider that procedure and whether the price reflected the market value
at the time.

193.    The present context is that when a Defendant Institution wished to request
redemption of its shares in a Fund, it did not engage in arm's-length negotiations with the Fund
to fix the Redemption Price in the traditional sense. Instead, the procedure in Articles 10 and
11 was put into motion. That procedure had been laid down by the Fund to attract investors,

who were independent of the Fund and free to accept or reject that procedure. It provided for the parties to be bound to a price fixed by reference to NAV, which would be determined by a valuer selected by the Fund (its directors or Citco) who would undertake "*highly complex assessments of asset value and judgments.*" (Second Moss Declaration ¶ 254). The court may well think that, on its face, this procedure was at least as robust as the normal arm's-length negotiation that would precede, for example, the sale of a house.

194.    Mr Moss may be correct that there was no market for shares in the Fund in the traditional sense.[178] This was because each Fund was an open-ended collective investment fund,[179] with value passing through subscriptions and redemptions. The presence of a traditional market for an item is not essential for the determination of market value, as is indicated by *Jowett's Dictionary of English Law*,[180] which defines "market price" or "market value" as "*the value that an asset would have in an arm's-length transaction between a willing buyer and a willing seller.*" This is much the same as the test stated by Lord Scott in *Phillips v Brewin Dolphin Lawrie Ltd*[181] and the tests adopted by Jonathan Parker J in *Re Brabon*[182] and by David Richards J in *Stanley v TMK Finance Ltd*,[183] which I quoted in the First Mortimore Declaration at ¶ 238.

195.    Here, the Defendant Institution was a willing seller, who could study information about NAV published on behalf of the Fund and choose the time of sale. The Fund was a willing buyer, in that it had willingly offered its shares to potential subscribers and had agreed to be bound by Articles 10 and 11, which set out the procedure for determining NAV.

---

[178] Footnote 87 to the Foreign Representatives' Memorandum of Law in Opposition to the Defendants' Consolidated Memorandum of Law says: "*Sentry's shares were listed on the Irish stock exchange*," so that some market trading may have been possible.

[179] Mr Hare's Declaration at ¶ 8.

[180] (4th ed, 2015).

[181] [2001] 1 WLR 143 at § 30, English House of Lords.

[182] [2001] 1 BCLC 11, 38, English High Court.

[183] [2010] EWHC 3349 (Ch) at § 7, English High Court.

196.    Perhaps the strongest indication that the Redemption Price fixed under the Articles represented market value is that the same determination of NAV applied to the subscription price paid by subscribers under Articles 9 and 11. Subscribers were willing arm's-length purchasers able to choose whether to place investments with the Funds or with other institutions, and they chose the Funds.

*(b)    Matters to be taken into account*

197.    At ¶¶ 243-259 of the Second Moss Declaration, Mr Moss takes issue with my summary of the relevant principles that the English courts have adopted to determine whether the consideration received by the company was a significant undervalue (First Mortimore Declaration at ¶¶ 234-243).

198.    In order to assess the propriety of the price fixed by the parties, the court has to look back, as it does when determining inability to pay debts for a preference or undervalue claim, or ordinary course of business for a preference claim. The test is an objective one under which, as David Richards J said in the *Stanley* case (First Mortimore Declaration at ¶ 238), the court puts itself in the position of "*a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying.*" What would be known to such a reasonably well-informed purchaser sets the limits to what may be taken into account.

199.    The significance of the *Stanley* case is that it is a judgment of David Richards J, now Lord Justice David Richards in the English Court of Appeal, who has exceptional experience of insolvency and company law matters, and in which he considers the *Brewin Dolphin* decision. David Richards J had to consider submissions on behalf of the purchaser that "*in general, the court should confine itself to matters capable of being known to a hypothetical purchaser at the valuation date*" and on behalf of the liquidators of the vendor that "*the task of the court is to make a finding as to value based on all the evidence available to it, provided of course it is relevant and cogent,*" which could include evidence of a later event, provided it

"*genuinely sheds light on open market value at an earlier date.*"[184] David Richards J considered

the judgment of Lord Scott in *Brewin Dolphin*, quoting from the important paragraph 26, and

said of it:

> "*The decision of the House of Lords establishes that, in appropriate circumstances, regard may be had to subsequent events, but it was in the context of attributing [a nil] value to a covenant which was, <u>on the facts known at the date of the transaction</u>, precarious.*"[185]

David Richards J held that he was entitled to have regard to the price obtained on a sale of the

property about a year after the impugned transaction in order to establish by inference the value

of the property at the date of the earlier transaction, provided that (i) there had been no

significant change in market conditions between the two dates, and (ii) the circumstances of

the later sale are such that they can reliably establish market value at the earlier date. The

market value so inferred would be information that "*the rational and reasonably well-informed*

*purchaser*" at the time of the impugned transaction could have ascertained.

200.    The *Stanley* case shows that, in relation to an undervalue claim, evidence of

subsequent events can be used only for the purpose of putting a value on something that was

known about, but had an uncertain value (the sub-lease covenant in *Brewin Dolphin* or the life

policy or the example of the lottery ticket in *Re Thoars*[186]), or to enable inferences to be drawn

as to market value at the date of the transaction (*Stanley*). I am not aware of any case where the

court has admitted evidence of subsequent events for any other purpose or has taken into

account information that would not have been known to "*the rational and reasonably well-*

*informed purchaser*" at the time of the transaction. This state of English law is consistent with

---

[184] At §§ 9-18.

[185] Emphasis added; at § 14.

[186] [2003] 1 BCLC 499 at §§ 17, 20, 21. This case is noted in the First Mortimore Declaration at ¶ 237 footnote 213 and the Second Moss Declaration quotes from it at ¶ 246. In this case Sir Andrew Morritt V-C at § 20 said that a valuer of a lottery ticket, valuing it at the date of the transaction "*is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m.*"

the law in relation to cash-flow insolvency and ordinary course of business, as described above. It represents a limited departure, for the purposes of undervalue claims, from the general rule about the valuation of shares in a company, which "*is to reject evidence of events which occurred after the valuation date*."[187]

  *(c) Use of hindsight*

201. Mr Moss suggests (Second Moss Declaration at ¶¶ 253, 256, 258) that it may not matter whether the claims of investors or other creditors of BLMIS or the claims of the BLMIS Trustee are regarded as a use of hindsight or reliance on evidence of subsequent events. In my opinion, reference to those claims would involve the inadmissible use of hindsight or speculation, because they were unknown and would not have been known to a person in the position of "*the rational and reasonably well-informed purchaser*" at the times of the transactions.

202. Mr Moss also suggests that the true value of the Funds' shares was uncertain (Second Moss Declaration at ¶ 254), so that evidence of subsequent events can be adduced in accordance with *Brewin Dolphin*. I do not agree. In *Brewin Dolphin*, the obligation to make payments under the sub-leases was known about and its value was known to be uncertain and precarious. Similarly, the value of the policy on the life of the debtor in *Re Thoars* was known to be uncertain, given his known state of health.[188] In contrast, the value of the shares in the Funds was thought to be certain in that it was based on certificates which were, or which purported to be, conclusive.

---

[187] *Joiner v George* [2003] BCC 298, English Court of Appeal, at § 68, where authority for the rule was cited (referred in the First Mortimore Declaration at ¶ 239 and in the Second Moss Declaration at ¶ 244).

[188] [2003] 1 BCLC 499.

(d)     *Application of BVI law to the facts stated in the Amended Complaints*

203.    What I have said in paragraph 172 above in relation to cash-flow insolvency applies to the undervalue issue, and there is nothing more that I need to add to what I said there and in the First Mortimore Declaration at ¶¶ 244-248.

### (3)     Good faith business transactions benefitting the Funds

204.    On this issue, the only matter in the Second Moss Declaration that requires a response is at ¶ 270, where Mr Moss refers to a passage in *Palmer's Company Law*, which suggests that the purpose of the good faith business transaction exemption or defence (depending on whether the presumption applies) is that it enables those running a struggling company to enter into transactions on what would otherwise be regarded as unfavourable terms in order to keep the company going. I agree that is a purpose of the provision, but its application is not restricted to such a situation. It applies whenever the three statutory requirements are satisfied (First Mortimore Declaration at ¶¶ 251-253).

## 10.    THE PREFERENCE AND UNDERVALUE CLAIMS WHERE THE CITCO SUBSCRIBER IS THE MEMBER OF THE FUND

205.    The Proposed Fourth Amended ABN Amro Complaint alleges that the Citco Subscriber, not the Citco Record Subscriber,[189] was the member of the Fund who received the preference and with whom the Fund entered into an undervalue transaction, and that since it

---

[189] The Liquidators cannot rely on the presumptions under sections 245(4) and 246(4) where they allege that the preference was given to, or the Redemption transaction was entered into with, the Citco Subscriber, but the shares were registered in the name of the Citco Record Subscriber, which seems to have been the intended position under the B&C Agreements (see clause 7.1.1 of Exhibit G to Mr Molton's declaration). In this connection, there is an apparent conflict between ¶¶ 9 and 124 of the Proposed Fourth Amended ABN Amro Complaint, which allege that the Citco Record Subscriber was the registered member, and ¶¶ 235 and 247, which allege that the Citco Subscriber was the registered member. If the Citco Record Subscriber was the registered member, the vulnerability period is reduced from 2 years to 6 months: section 244(1) of the BVI Insolvency Act.

was the registered member, the presumptions in subsections 245(4) and 246(4) apply in relation to inability to pay debts, ordinary course of business and good faith business transaction.[190]

206.    Even if the Liquidators are right (and were the Court to allow them to further amend the Complaints) to plead that the alleged preferences were given to the Citco Subscriber and that the alleged undervalue transactions were entered into with the Citco Subscriber, then, by section 249(1) of the BVI Insolvency Act, the BVI Court may only go on to make an order under that subsection if it is satisfied that there has, in fact, been an unfair preference or undervalue transaction. It is hard to see how the BVI Court could be satisfied of those matters when the party (*i.e.* the Citco Subscriber) whose relationship with the Funds gives rise to the presumptions of inability to pay debts, transaction outside the ordinary course of business and non-good faith business transaction, which are essential components of the Liquidators' claims, has not been joined as a defendant to, or served with, the proceedings. The injustice to parties in the position of the Defendant Institutions is manifest.

207.    If nevertheless the BVI Court were to be satisfied that a preference had been given to the Citco Subscriber or that it had entered into an undervalue transaction with the Funds, the BVI Court may go on to consider what, if any, relief may be awarded under section 249 of the BVI Insolvency Act against the Defendant Institutions. The Proposed Fourth Amended ABN Amro Complaint alleges that the Redemption Payments were paid to the Citco Subscriber, who may have paid them on to the Defendant Institutions.[191] In respect of the preference and undervalue claims, the Prayer for Relief in the Proposed Fourth Amended ABN Amro Complaint claims payment of money from the Defendant Institutions;[192] *i.e.* the

---

[190] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 235-237, 239-242 in relation to the preference claim and ¶¶ 247-251 in relation to the undervalue claim.

[191] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 232, 241, 250.

[192] Proposed Fourth Amended ABN Amro Complaint at ¶¶ C(iii) and D(iii) of the Prayer for Relief.

Liquidators seek an order for payment of money against the Defendant Institutions under subsections 249(1)(b) and 249(2)(d).[193]

208.    Section 249 is subject to section 250, which limits the orders that may be made under section 249. By subsection 250(2) an order made under subsection 249(1) shall not:

> "(a)    prejudice any interest in assets that was acquired in good faith and for value from a person other than the company, or prejudice any interest deriving from such an interest; or
>
> (b)    require a person who received a benefit from the transaction in good faith and for value to pay a sum to the [liquidator], except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he was a creditor of the company."

The applicable protective provision for an order for payment of money under subsection 249(2)(d) would seem to be subsection 250(2)(b),[194] under which an order for payment of money cannot be made against a person who (i) received a benefit from the transaction in good faith and for value, and (ii) was not a party to the transaction and was not given a preference when he was a creditor of the company.

209.    Since the Defendant Institutions were not members of the Funds,[195] the presumption in subsection 250(3) applies. This states:

> "For the purposes of subsection (2), where a person would, apart from the requirement of good faith, fall within the circumstances specified in paragraph (a) or (b), it is presumed, unless the contrary is proved, that he acquired the interest or received the benefit in good faith."

210.    Subsections 250(2) and (3) are closely modelled on subsections 241(2) and (2A) of the English Insolvency Act.[196] On the basis that the Defendant Institutions received any

---

[193] The comparable provisions of the English Insolvency Act are subsections 238(3), 239(3) and 241(1)(d).

[194] Subsection 250(2)(a) seems to be directed towards orders that might be made under subsections 249(2)(a)-(c), for the vesting of property in the company or the release of security given by the company or of liabilities of the company. The provisions of the English Insolvency Act comparable to subsections 249(2)(a)-(c) are subsections 241(1)(a)-(c).

[195] Subsection 250(4)(b) of the BVI Insolvency Act. Subsection 250(4)(a) does not apply to the facts stated in the Proposed Fourth Amended ABN Amro Complaint.

[196] There is one English Court of Appeal decision on these subsections that should be mentioned: *Re Sonatacus Ltd* [2007] 2 BCLC 627. In that case the appellant, CIL, had lent £65,000 to S, the sole director of the company, who lent it on to the company. When the company was insolvent and shortly before it went into liquidation, S

payment from the Citco Subscriber (not the Funds), were not parties to the undervalue transactions and were not creditors of the Funds when the alleged preferences were given and also gave value, they are entitled to the protection of the presumption given by subsection 250(2); *i.e.* that they received the payments from the Citco Subscriber in good faith. Subsection 250(2) does not require the value to have been received by the company; on the contrary, it would usually have been received by the person from whom the benefit was obtained. Nor does the subsection say anything about the amount of the value. Accordingly, while the value must be more than nominal, it need not be adequate or commensurate with the benefit received.[197]

211.    Since the presumption in subsection 250(3) applies to the Defendant Institutions, the Liquidators have the burden of pleading and (if the case is allowed to proceed) ultimately establishing their lack of good faith. In this respect, the law outlined in the First Mortimore Declaration at ¶¶ 110-114 and 131 and in paragraphs 98-104 above applies. For the reasons explained in paragraphs 111-121 above, the alleged bad faith of the Citco Subscriber would not be attributed to the Defendant Institutions, and the Liquidators have not otherwise independently pleaded that the Defendant Institutions acted in bad faith.

212.    As to value, that would be satisfied by the release of the Defendant Institutions' interest in the shares for which the Funds made the Redemption Payments to the Citco Subscriber.

---

caused it to transfer £50,000 to CIL. The case reached the Court of Appeal in an unsatisfactory state. That Court held that the effect of the transfer was to discharge *pro tanto* the company's debt to S and that it was an unfair preference (§ 17). The liquidators' claim against CIL was under subsection 241(1)(d), subject to a defence under subsection 241(2) (§ 23). As to that, counsel for CIL accepted that the onus was on CIL to satisfy the court as to good faith (§§ 27, 34); *i.e.* it did not rely, or try to rely, on the presumption in subsection 241(2A). The Court of Appeal dismissed the appeal and affirmed the order that CIL repay the £50,000 with interest.

[197] There are no cases on the meaning of value in subsection 250(2) or subsection 241(2), 342(2) or 425(2) of the English Insolvency Act, but authorities on fraudulent conveyance cases under section 172 of the Law of Property Act and the Statute of Elizabeth interpreted "*good consideration*" in the sense that I have stated; see e.g. *Bayspoole v Collins* (1871) LR 6 Ch App 228, 232, 233: "*small and inadequate consideration is sufficient to support such a settlement under the Statute of Elizabeth.*" The same approach applies to the question of whether a person is a bona fide purchaser for value.

## 11.    THE COURT WHICH MAY MAKE ORDERS UNDER SECTION 249

213.    The question of whether a U.S. court may order relief under section 249 of the BVI Insolvency Act is addressed in the First Mortimore Declaration at ¶¶ 258-266 and in the Second Moss Declaration at ¶¶ 276-301. The main counterargument put forward by Mr Moss is that the provision in section 249 about the court that may make orders under that section is not part of the substantive law of the BVI, but is merely procedural. I will address this argument under four headings: (i) the common law as to the distinction between substance and procedure, (ii) the scheme of the BVI Insolvency Act, of which the provisions about "*Voidable Transactions*" form a part, (iii) the distinctions between those provisions and provisions about transactions defrauding creditors, and (iv) the Liquidators' reasons for not pursuing claims against the Defendant Institutions in the BVI.

214.    Before doing so, I should deal with three preliminary points. First, I agree with Mr Moss (¶ 276) that the provisions of sections 245, 246 and 249 have extraterritorial effect, in the sense that they may apply to transactions undertaken within or outside the BVI.

215.    Second, at ¶ 278, Mr Moss suggests that in the First Mortimore Declaration (¶ 260), I misstated the definition of "court" in the BVI Insolvency Act. This is not correct. In that paragraph, I said "court" means "*the BVI Court, described in Section 1 above*." In ¶ 13 of that Section, I had defined "the BVI Court" as "*the High Court of Justice (Commercial Division) in the Eastern Caribbean Supreme Court*." The Commercial Division of the BVI Court is the division that deals with liquidations and commercial litigation.

216.    Third, at ¶¶ 295-299, Mr Moss refers to *Galbraith v Grimshaw*[198] and *Al Sabah v Grupo Torras SA*[199] and to passages in the judgment of Lord Walker in *Grupo Torras*, which

---

[198] [1910] AC 508, House of Lords.

[199] [2005] 2 AC 333, Privy Council, on appeal from the Court of Appeal of the Cayman Islands.

are critical of aspects of *Galbraith v Grimshaw*.[200] Regardless of the criticisms to which Mr

Moss points, as I said in the First Mortimore Declaration at (¶ 261), Lord Walker cited

*Galbraith v Grimshaw* for the proposition that a litigant may find himself "*falling between two*

*stools*,"[201] if neither the court where the insolvency proceedings are taking place nor the foreign

court have the powers to make the necessary asset recovery orders. It remains the case that a

claim may fall "*between two stools*" unless, as I pointed out (¶ 263), the powers of the foreign

court enable it to assist by applying its own law (as in *Grupo Torras*[202]) or the law of the place

of the liquidation (which is what is sought by the Liquidators in the Amended Complaints).

### (1)    Common law as to substance and procedure

217.    The common law of the BVI and England recognises the distinction between

questions of substance, which are governed by the *lex causae*, which includes questions as to

parties' substantive rights or liabilities, and questions of procedure, including remedy, which

are governed by the law of the forum.[203] Thus, the law of England includes substantive rules

governing liability for personal injury caused by negligence or breach of statutory duty, so that

a person injured by such torts has a substantive right or cause of action under English law. As

a matter of English procedural law, claims for damages below a certain figure may be allocated

to the County Court and claims over that figure to the High Court. In an appropriate case, a

foreign court, applying its own conflict of laws rules, could apply the substantive tort law of

England to a tort claim governed by that law, while disregarding English procedural rules about

---

[200] At §§ 41 and 45.

[201] At § 7.

[202] In *Grupo Torras*, the trustee in bankruptcy of the debtor in a Bahamian bankruptcy obtained a letter of request from the Bahamas court asking the Cayman court to set aside two Cayman trusts established by the debtor. The Privy Council affirmed that the Cayman court had power, under its own bankruptcy assistance legislation, to act in aid of the Bahamian bankruptcy by granting the trustee powers under Cayman bankruptcy law to enable him to set aside the trusts.

[203] *Harding v Wealands* [2007] 2 AC 1 at § 24, English House of Lords; *Cox v Ergo Versicherung AG* [2014] AC 1379 at § 14, UK Supreme Court; *Allen v Depuy International Ltd* [2015] EWHC 926 (QB) at § 34, English High Court. In *Cox* Lord Mance described the distinction between substantive and procedural issues as "*difficult*" (§ 43).

damages and venue. The foreign court can deal with the claim under English substantive law, because the claim exists independently of the venue to which it might be allocated under English procedural law. This provides the common law background for the enactment of the BVI Insolvency Act and the English Insolvency Act, which both have extraterritorial and cross-border assistance provisions.

### (2)    The scheme of the BVI Insolvency Act

218.    At ¶¶ 278-285 of the Second Moss Declaration, Mr Moss expresses the opinion that the reference to the "*Court*" in section 249 is procedural and that, read with the definition in Section 2, its purpose is to identify the BVI High Court, rather than the Magistrates Court or any other Virgin Islands Court, as the court able to exercise the specified powers under the BVI Insolvency Act. I agree that this is a purpose of those provisions, but it is only a minor purpose as compared with the major purpose, which is to place the BVI High Court at the heart of the statutory scheme for, among other things, the liquidation of companies. Integral elements of that scheme are the provisions for the BVI High Court to identify and grant relief in respect of what are called "voidable transactions" (sections 244-246 and 249, 250).

219.    The BVI Insolvency Act covers a range of matters relating to the insolvency of companies and individuals. The Parts of that Act which are in force and relevant to the liquidation of the Funds are: Part I (preliminary provisions, including definitions), Part V (provisions applicable to the liquidation of companies and to the bankruptcy of individuals), Part VI (liquidation), Part VIII (voidable transactions), Part IX (malpractice), Part XI (general provisions with regard to companies that are insolvent or in liquidation) and Part XVI (general provisions with regard to insolvency proceedings under that Act). Part XVIII (cross-border insolvency) might have been relevant, but it is not yet in force. Those Parts contain many sections that refer to applications to the BVI Court or to orders it may make, some of which have substantive effect and some of which are procedural.

220.   Examples of substantive orders that the statute gives the BVI Court power to make, which affect the rights and liabilities of the company or other persons, are orders:

(a)   vesting property that has been disclaimed by a liquidator in a person who claims an interest in it or who is under a liability in respect of the property that has not been discharged by the disclaimer (sections 221, 222);

(b)   rescinding a contract made by a person with the company (section 229);

(c)   in respect of voidable transactions (sections 244-250); and

(d)   making a person guilty of fraudulent trading or insolvent trading liable to make such contribution to the company's assets as the BVI Court considers proper (sections 253-258).

All those rights and liabilities are created by the BVI Insolvency Act and do not exist independently of it. In each case, the discretion of the BVI Court, signified by the word "*may*," is an integral element of the statutory power.[204]

221.   Examples of procedural orders that may be made by the BVI Court, which concern process or affect the enjoyment of rights, are orders:

(a)   staying actions and proceedings against the company (section 174),[205] permitting the continuance of an action or proceedings against the company or its assets or to permit the transfer of shares (section 175), affecting the benefit of executions (section 176);

---

[204] All those statutory powers derive from similar powers in the English Insolvency Act; see sections 181, 182, 186, 213, 214, 238-241. In the recent UK Supreme Court decision *Joint Administrators of LBH Holdings Intermediate 2 Ltd v Joint Administrators of Lehman Brothers Ltd* [2017] UKSC 38, there was a difference of provisional view between Lords Neuberger, Kerr and Reed on the one hand and Lords Sumption and Clarke on the other as to whether payment in full of a proof of debt affected the substantive right of the creditor to full payment under the currency of the debt; see §§ 97-111, per Lord Neuberger, and §§ 195-201, per Lord Sumption.

[205] This section is comparable in effect to section 52(2), referred to in the Second Moss Declaration at ¶ 279.

(b)      controlling or giving directions in respect of the powers of the liquidator (section 186);

(c)      against delinquent directors (section 254); and

(d)      for the examination of witnesses (section 285).[206]

222.     In English cross-border insolvency law, the distinction between substance and procedure has been noted. In the First Mortimore Declaration (footnote 234 to ¶ 265), I referred to *Rubin v Eurofinance AS*,[207] where Lord Collins said that the powers in Article 21(1) of the English Cross-Border Insolvency Regulation were procedural and did not give the English court the substantive power to recognise a judgment made in insolvency proceedings in New York, where the judgment debtor had not been present in New York or voluntarily appeared in the New York proceedings. In *Re Pan Ocean Co Ltd*,[208] another Article 21 case, where the English court had recognised a Korean rehabilitation proceeding as a foreign main proceeding, Morgan J refused to grant an injunction, on the application of the Korean administrator, restraining a party from terminating a contract with the company which was governed by English law, because such an order went "*well beyond matters of procedure and affects the substance of the parties' rights and obligations under the contract.*"

223.     In paragraph 220(c) above, I included an order in respect of voidable transactions among the substantive orders that the BVI Court may make. Sections 244-246, 249 and 250 should be read together. As I have pointed out (First Mortimore Declaration at ¶ 146), sections 245 and 246 state the elements of an unfair preference or undervalue transaction, but not the consequences. For those, one turns to section 249, which is subject to

---

[206] These sections also derive from the English Insolvency Act: see sections 126-128, 130, 168, 212, 236. It is well established that the power, on a summary hearing, to make orders against delinquent directors under section 254 of the BVI Insolvency Act or section 212 of the English Insolvency Act is a procedural power, since the company's cause of action against the director for breach of duty exists independently under the general law.

[207] [2013] 1 AC 237 at § 143.

[208] [2014] EWHC 2124 (Ch) at § 111.

section 250. The key provision is subsection 249(1), because that contains all the strands: (i) the application to the BVI Court by the liquidator,[209] (ii) the determination by the BVI Court whether the requirements of sections 245 or 246 have been satisfied, and (iii) the exercise by the BVI Court of its discretion to make any, and if so what, order. It is, therefore, clear that a liquidator's substantive legal right to bring a claim under section 249 is inexorably linked to the power of the BVI Court to hear the application and make any appropriate orders. There is no free-standing substantive legal right to relief for unfair preferences or undervalue transactions.

224.    At ¶ 279 of the Second Moss Declaration, Mr Moss refers to the definition of "*Virgin Islands court*" in section 2(1) of the BVI Insolvency Act and to the reference to those courts in sections 8(1)(b), 8 (2)(b) and 52(2) of that Act (which may be compared with section 174, the corresponding liquidation provision). Those sections refer to proceedings outside the liquidation proceedings, which may be stayed to enable the liquidation to proceed unimpeded, or to orders made before the liquidation commenced and which may be relevant to questions of whether liquidators should be appointed (sections 159, 162 and 163) or whether an insolvency transaction occurred (section 244). These sections have no effect on the many sections, including section 249, which provide that the BVI Court is the only court with power to make substantive or procedural orders in the liquidation.

225.    In ¶¶ 281-284 of the Second Moss Declaration, Mr Moss refers to sections 238 and 239 of the English Insolvency Act concerning preferences and undervalue transactions, which refer to the power of "*the court*," identified in sections 251, read with section 117. Under the English Insolvency Act, the High Court and a County Court may have jurisdiction to wind

---

[209] If a liquidator wishes to apply to the BVI Court for an order under section 249, he would normally do so in the liquidation proceedings by ordinary application in his own name (under the same case number that was allocated to the originating application to appoint the liquidator), supported by an affidavit containing the evidence on which he relies in support of his application (BVI Insolvency Rules, Rules 12-14). In an appropriate case the BVI Court may give permission to serve the proceedings outside the jurisdiction; see paragraph 234 below.

up a company and therefore they have power to make orders in its winding up under sections 238 and 239. There is no similar choice of courts in the BVI; the BVI Court is the only court with power to appoint liquidators and make orders in the liquidation, including orders under section 249 of the BVI Insolvency Act. In my opinion, the word "*court*" in sections 238 and 239 of the English Insolvency Act and in section 249 of the BVI Insolvency Act cannot be detached from their substantive provisions, as one would have to do to argue that the reference to it is procedural whereas the rest of the sections are substantive. Mr Moss has not identified any case where that has been done. On the contrary, the contemplation of the English legislation is that the court dealing with the liquidation would also deal with applications under sections 238 or 239 and the position is the same in the BVI, regarding section 249.

226.    I agree with Mr Moss (Second Moss Declaration at ¶ 285) that BVI and English insolvency legislation, even though they may have extraterritorial reach (paragraph 214 above), do not purport to give powers to foreign courts. The BVI and English Acts recognise that foreign courts will exercise their own powers, supplemented by any cross-border assistance provisions that apply to them (First Mortimore Declaration at ¶¶ 262-265).

227.    At ¶ 287 of the Second Moss Declaration, Mr Moss refers to *England v Smith*.[210] That was a case where the liquidation of an Australian company was being conducted in Australia. The Australian court issued a letter of request to the English court asking it to assist by conducting an examination of a witness under the principles and practice of the Australian courts. By subsection 426(5) of the English Insolvency Act, the letter of request gave the English court power to apply, in relation to the matters specified in the request, either English law or Australian law. The Court of Appeal held that the request should be acceded to and that, in exercise of its power under subsection 426(5), the examination should be conducted under Australian law. The decision turns on the powers given to the English court under subsection

---

[210] [2001] Ch 419, English Court of Appeal.

426(5), which are not found in Part XVIII of the BVI Insolvency Act or the English Cross-Border Insolvency Regulation. As I noted in the First Mortimore Declaration (footnote 233 to ¶ 264), the BVI will have a similar power to apply the law of the requesting state when section 467 comes into force.

### (3) Statutory fraudulent transfer proceedings distinguished

228.    At ¶ 280 of the Second Moss Declaration, Mr Moss refers to *In re Hellas Telecommunications (Luxembourg) II SCA*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015), where the Court accepted Mr Moss's opinion that section 423(4), which identifies the court for the purposes of section 423 of the English Insolvency Act (transactions defrauding creditors), is a procedural provision. I note that in the subsequent ruling, *In re Hellas Telecommunications (Luxembourg) II SCA*, 555 B.R. 323, 329, 342 (Bankr. S.D.N.Y. 2016), the Court noted, when granting the defendants' *forum non conveniens* motion, that "*the relief sections of the U.K.'s Insolvency Act 1986 appear to provide discretion to a U.K. court to tailor relief in a way that this Court could not do*" and that the defendants argued in support of their motion that, if the action remained pending before the Court, it would have to resolve a difficult issue of first impression under U.K. law, *i.e.* "*whether a U.S. court is authorised to grant relief under Section 423 of the U.K. Insolvency Act*." Even if Mr Moss's opinion is correct, there are two points of distinction between the present case and the *Hellas* case.

229.    The first is that there is a distinction between sections 238 and 239 of the English Insolvency Act (transactions at undervalue and preferences) and section 423. The former sections only apply where the company is in administration or liquidation (subsections 238(1) and 239(1)). This means that the references to the court in those sections is to the court with jurisdiction to wind up the company (section 251). An application for relief under those sections can only be made by the administrator or liquidator[211] and he would do so by making

---

[211] As from 1 October 2015 the administrator or liquidator may assign the claim under Section 246ZD.

an application to the court under the English Insolvency Rules within the administration or liquidation proceedings. The substantive provisions of sections 238 and 239 are so closely connected with the statutory scheme for administration and liquidation, that it is not possible to say that the reference to "*court*" in those sections is procedural, when they give the court substantive powers to affect the rights and liabilities of other parties.

230.    On the other hand, section 423 may apply in a variety of situations: (i) if the debtor is a company, when it is in administration or liquidation, (ii) if the debtor is an individual, when he or she is bankrupt, (iii) when the debtor is subject to a voluntary arrangement under the English Insolvency Act, and (iv) when the debtor is not subject to any of those proceedings. Proceedings can be brought either within the insolvency proceedings or outside them by ordinary action. It is for this reason that subsection 423(4) gives jurisdiction not just to the High Court, but the County Courts with applicable bankruptcy or winding up jurisdiction. If the application is made in administration, liquidation or bankruptcy proceedings, it is made by application and will proceed under the English Insolvency Rules, but if it is made by a victim outside such proceedings, it will proceed by claim form with particulars of claim in accordance with the English CPR.[212]

231.    Secondly, there is no provision comparable to section 423 of the English Insolvency Act in the BVI Insolvency Act. The comparable BVI provision is section 81 of the BVI Conveyancing and Law of Property Act (Cap 220), which provides:

> "*(1)    Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Ordinance, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.*
> *(2)    This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.*
> *(3)    This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith to any person not having at the time of the conveyance, notice of the intent to defraud creditors.*"

---

[212] *TSB Bank plc v Katz* [1997] BPIR 147, English High Court.

This section derives from the English section 172 of the Law of Property Act 1925, which has been repealed and was replaced by section 423 of the English Insolvency Act. The section gives a victim a substantive legal right that is independent of any procedural rules about venue and that is not tempered by any controlling discretion of any court. Normally, the victim would bring proceedings under section 81 by action under the BVI CPR, but the BVI Court might permit a liquidator to bring proceedings in the liquidation on behalf of all creditors.[213]

### (4)    The Liquidators' justification for not pursuing proceedings in the BVI

232.    At ¶ 301 of the Second Moss Declaration, Mr Moss says that if the claims, the subject of the US Proceedings, had been brought in the BVI, any judgments would be likely to be unenforceable outside the jurisdiction of the BVI. He also says that a common feature of the claims is that the Defendant Institutions submitted to the jurisdiction of this Court under the subscription agreements.

233.    The first point I should make about that is that it is important to keep in mind that the US Proceedings include two groups of claims, which under BVI law are distinct. First, there are the Common Law Claims, where the Funds are the proper plaintiffs. These claims exist independently of the liquidation proceedings. Second, there are the BVI Insolvency Act Claims, where the Liquidators (not the Funds) are the proper applicants or plaintiffs and the claims only arose in consequence of the appointment of liquidators (First Mortimore Declaration at ¶ 148).

234.    The Common Law Claims could have been brought by the Funds in the BVI Court by claim form and statement of claim under the BVI CPR. Indeed, the Common Law Claims against the BVI Defendants could have been added to the claims brought against them in the BVI Redeemer Proceedings. Permission to serve the Defendant Institutions with claim

---

[213] *Re Shilena Hosiery Co Ltd* [1980] Ch 219, English High Court.

forms asserting the Common Law Claims out of the jurisdiction of the BVI could have been obtained from the BVI Court in the same way as permission was obtained to serve the claim forms in the BVI Redeemer Proceedings out of the jurisdiction. The Funds could have relied on BVI CPR 7.3(3)(b)(ii) as the "gateway."[214] The currently applicable "gateway" under the BVI CPR is 7.3(b):

> *a claim is made in respect of a contract where the contract - … (ii) is by its terms or by implication governed by the law of any … Territory.*"

The BVI is a territory and the Articles of the Funds are the contracts which, by necessary implication, are governed by BVI law.[215]

235.    The BVI Insolvency Act claims could have been brought by the Liquidators by applications in the liquidation proceedings in the BVI Court. By BVI Insolvency Rule 24, the BVI CPR Parts 6 and 7 apply as to service. The relevant "gateway" for a claim under section 249 of the BVI Insolvency Act is BVI CPR 7.3(10):

> *"A claim is made under an enactment which confers jurisdiction on the court and the proceedings are not covered by any other of the grounds referred to in this rule."*

The claim would be made under an enactment, the BVI Insolvency Act, which plainly confers jurisdiction on the BVI Court in relation to the liquidation of a BVI incorporated company.[216]

236.    Mr Moss suggests that there would be difficulties about enforcement of any judgment obtained in either type of proceeding. Under English law, such a judgment would be enforced and recognised in the United Kingdom if the judgment debtor had submitted to the jurisdiction of the BVI Court by voluntarily appearing in the proceedings.[217] In respect of the

---

[214] See the Declaration of Philip Kite dated the 12th day of January 2017 at ¶ 23.

[215] *Dicey, Morris & Collins; The Conflict of Laws* (15th ed), Rule 175(2) at § 30R-020.

[216] *Erste Group Bank AG (London) v JSC (Red October)* [2015] EWCA Civ 379 at § 113; also see the case in the High Court [2013] EWHC 2926 (Comm) at § 150 (a case under section 423 of the English Insolvency Act); *Avonwick Holdings Ltd v Castle Investment Fund Ltd* [2015] EWHC 3832 (Ch) (sections 238, 239 and 423 of the English Insolvency Act).

[217] *Dicey* Rule 43 at § 14R-054; affirmed in *Rubin v Eurofinance SA* [2013] 1 AC 237, UK Supreme Court.

Common Law Claims, Defendant Institutions might voluntarily appear and submit to the jurisdiction by acknowledging service and giving notice of intention to defend. In respect of the BVI Insolvency Act Claims, the Defendant Institutions might voluntarily appear by responding to the application or by filing a claim in the liquidation proceedings.[218]

237.    The suggestion that the choice of law provisions in the subscription agreements apply to the Common Law Claims is contradicted by the Funds' applications to serve the BVI Redeemer Proceedings out of the jurisdiction, where the Funds asserted that the claims were governed by BVI law.[219] The BVI Court accepted that and gave permission to serve the claim forms on the BVI Defendants out of the jurisdiction. Moreover, in the Privy Council Judgment, Lord Sumption held that the claims were governed by BVI law and that the subscription agreements were irrelevant (at § 20). The subscription agreements have nothing to do with the BVI Insolvency Act Claims, which are founded on the BVI Insolvency Act. Moreover, the right to assert the BVI Insolvency Act Claims belongs not to the Funds, but the Liquidators, which were not party to the subscription agreements, confirming their irrelevance.[220]

[Remainder of page intentionally left blank]

---

[218] *Rubin v Eurofinance SA* [2013] 1 AC 237; *Stichting Shell Pensioenfonds v Krys* [2015] AC 616.

[219] Mr Kite's Declaration at ¶ 22 and Exhibit P.

[220] See cases cited in the First Mortimore Declaration at ¶¶ 197, 198. In *New Cap Reinsurance Co Ltd v Grant* [2009] 257 ALR 740 at § 87, New South Wales Supreme Court, Barrett J said of an unfair preference claim in respect of commutation payments under a reinsurance contract: "*This proceeding has nothing to do with the reinsurance contract. It is a proceeding upon a statutory cause of action maintainable by the liquidator of one of the former contracting parties. The cause of action is not available to the party itself. Its liquidator, when suing upon the statutory cause of action, does not attempt to enforce some right of the contracting party*."

## CONCLUSION

238.    For the reasons I have given, my opinions are as stated in this Declaration.

239.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated this 26th day of May 2017

Signed: _____

Simon Mortimore, QC